**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ANONYMOUS MEDIA RESEARCH HOLDINGS, LLC | § | |
| v. | § | CASE NO. 2:23-CV-439-JRG-RSP |
| SAMSUNG ELECTRONICS CO., LTD., and SAMSUNG ELECTRONICS AMERICA, INC. | § | |

# CLAIM CONSTRUCTION ORDER

On March 18, 2025, the Court held a hearing to determine the proper construction of disputed terms in United States Patents No. 8,510,768, 8,677,389, 8,756,622, 10,719,848, 10,719,849, and 10,963,911. Before the Court is the Opening Claim Construction Brief (Dkt. No. 80) filed by Plaintiff Anonymous Media Research Holdings, LLC ("Plaintiff" or "Anonymous" or "AMRH"). Also before the Court are the Responsive Claim Construction Brief (Dkt. No. 87) filed by Defendants Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc. ("Defendants" or "Samsung"), Plaintiffs' reply (Dkt. No. 89), the parties' January 13, 2025 Joint Claim Construction and Prehearing Statement (Dkt. No. 76), and the parties' March 3, 2025 Joint Claim Construction Chart (Dkt. No. 95).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND** .......... **2**
**II. LEGAL PRINCIPLES** .......... **4**
**III. AGREED TERMS** .......... **7**
**IV. DISPUTED TERMS** .......... **8**
A. "content identification results," "a content identification result," and "content identifications" .......... 8
B. "clean play stream" .......... 13
C. "raw play stream" .......... 17
D. "play list" .......... 20
E. "in view of a pattern of the sample sequence data of the raw play stream compared to an expected pattern of sample sequence data" .......... 24
F. "at one or more computers," "using the one or more computers," and "by the one or more computers" .......... 29
G. "media measurement report" .......... 32
**V. CONCLUSION** .......... **37**

## I. BACKGROUND

Plaintiff has alleged infringement of United States Patents No. 8,296,791 ("the '791 Patent"), 8,510,768 ("the '768 Patent"), 8,677,389 ("the '389 Patent"), 8,756,622 ("the '622 Patent"), 10,572,896 ("the '896 Patent"), 10,719,848 ("the '848 Patent"), 10,719,849 ("the '849 Patent"), and 10,963,911 ("the '911 Patent") (collectively, the "patents-in-suit"). Dkt. No. 80, Exs. 1–8.

All of the patents-in-suit are titled "Media Usage Monitoring and Measurement System and Method." Plaintiff submits that the patents-in-suit "are directed to the use of content recognition systems in the media measurement context." Dkt. No. 80 at 1–2.

The ’849 Patent, for example, issued on July 21, 2020, and bears an earliest priority date of May 27, 2004. The Abstract of the ’849 Patent states:

> Media monitoring and measurement systems and methods are disclosed. Some embodiments of the present invention provide a media measurement system and method that utilizes audience data to enhance content identifications. Some embodiments analyze media player log data to enhance content identification. Other embodiments of the present invention analyze sample sequence data to enhance content identifications. Other embodiments analyze sequence data to enhance content identification and/or to establish channel identification. Yet other embodiments provide a system and method in which sample construction and selection parameters are adjusted based upon identification results. Yet other embodiments provide a method in which play-altering activity of an audience member is deduced from content offset values of identifications corresponding to captured samples. Yet other embodiments provide a monitoring and measurement system in which a media monitoring device is adapted to receive a wireless or non-wireless audio signal from a media player, the audio signal also being received wirelessly by headphones of a user of the monitoring device.

Plaintiff submits that the specifications of the ’791 Patent, the ’768 Patent, the ’389 Patent, and the ’622 Patent are substantially identical to one another and relate to recognition of audio content. The parties refer to these patents as the “Audio Patents.”

Plaintiff submits that the specifications of the ’896 Patent, the ’848 Patent, the ’849 Patent, and the ’911 Patent are identical to one another because the ’848 Patent, the ’849 Patent, and the ’911 Patent resulted from continuations of the ’896 Patent. Plaintiff submits that these patents relate to recognition of video content, and the parties refer to these as the “Video Patents.”

The parties also submit that for each of the Audio Patents, there is a corresponding Video Patent that has similar claim language, with the primary differences being replacing the word “audio” with the word “video.” Plaintiff refers to these as “patent pairs,” and the patent pairs are as follows:

The ’791 Patent and the ’896 Patent are referred to collectively as the “Deduced Play-Altering Activity Patents.”

The ’768 Patent and the ’848 Patent are referred to collectively as the “Scrubbing Patents.”

The ’622 Patent and the ’849 Patent are referred to collectively as the “Channel Identification Patents.”

The ’389 Patent and the ’911 Patent are referred to collectively as the “Sampling Patents.”

Plaintiff submits that “[t]he specification of the ’849 Patent is cited as representative throughout [Plaintiff’s Opening Brief]. While the earlier-issued ’791, ’768, ’389, and ’622 Patents share a different specification, the specification of the later-issued ’896, ’848, ’911 and ’849 Patents include only slight differences that are not material for resolving these claim construction disputes.” Dkt. No. 80 at 2 n.2.

Plaintiff no longer asserts the ’791 Patent or the ’896 Patent. Dkt. No. 90, Feb. 20, 2025 Joint Stipulation of Partial Dismissal.

Shortly before the start of the March 18, 2025 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties’ arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

“It is a ‘bedrock principle’ of patent law that ‘the claims of a patent define the invention to which the patentee is entitled the right to exclude.’” *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff’d*, 517 U.S. 370 (1996). “In some cases, however, the district court will need to look beyond the patent’s intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period.” *Teva*, 135 S. Ct. at 841

(citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90

F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might

use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

In their January 13, 2025 Joint Claim Construction and Prehearing Statement, the parties submitted that "[t]he parties have been unable to agree on any constructions at this time." Dkt. No. 76 at 1. Of note, however, several terms set forth in the parties' January 13, 2025 Joint Claim Construction and Prehearing Statement are no longer disputed, namely the "change a result of," "media content item," and "time window" terms. Dkt. No. 80 at 4; *see* Dkt. No. 76 at 4; Dkt. No. 87 at 4 n.4.

## IV. DISPUTED TERMS

### A. "content identification results," "a content identification result," and "content identifications"

| **"content identification results"**<br>**"a content identification result"**<br>**"content identifications"**<br>('768 Patent, Claims 1, 3, 4, 9, 11, 12;<br>'848 Patent, Claims 1, 3, 4, 9, 11, 12;<br>'622 Patent, Claims 1, 6, 10;<br>'849 Patent, Claims 1, 6, 10;<br>'911 Patent, Claims 1, 11) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary beyond plain and ordinary meaning. | "identifications of respective data samples"<br>"an identification of a respective data sample"<br>"identifications of respective data samples" |

Dkt. No. 76 at 2; Dkt. No. 80 at 5; Dkt. No. 87 at 4; Dkt. No. 95 at 2.

Shortly before the start of the March 18, 2025 hearing, the Court provided the parties with the following preliminary constructions: "identifications of respective data samples"; "an identification of a respective data sample"; and "identifications of respective data samples."

<u>(1) The Parties' Positions</u>

Plaintiff argues that "[b]ased on the claim language, a juror would readily understand that 'content identification results' refer to results of identifying content captured at a media monitoring device." Dkt. No. 80 at 5. Plaintiff argues that Defendants' proposal improperly implies that there are successful "identifications." *Id.* at 6. Plaintiff also argues that Defendants' proposal of "respective" creates ambiguity and "[t]o the extent Samsung introduces the word 'respective' to create a requirement that individual identifications must have a one-to-one relationship with

individual data samples, that is an improper attempt to read in limitations from a preferred embodiment into the claims." *Id.* at 7 (citation omitted).

Defendants respond that "[t]he intrinsic record demonstrates that content identification results and data samples correspond to one another on an individual basis." Dkt. No. 87 at 4. Defendants argue that, during *ex parte* reexamination of the '768 Patent, as well as during original prosecution of the '389 Patent, the patentee submitted declarations that are consistent with what Defendants are proposing. *Id.* at 4–6. Defendants also note that "the term 'respective' is used several times in the claim itself . . . ." *Id.* at 7.

Plaintiff replies that "Samsung identifies no clear, unequivocal statement in which the patentee relied on a one-to-one correspondence between data samples and content identification results." Dkt. No. 89 at 1.

At the March 18, 2025 hearing, Plaintiff emphasized that "respective" appears in only some of the claims and also that "respective" appears in other limitations and should not be imported into the "content identification results" terms. Defendants responded that their proposals are supported by surrounding claim language in all of the claims at issue and that the patents consistently disclose that for each sample there is only one identification. Plaintiff also argued that, for a particular sample, there may be multiple results, such as multiple failures to identify a match (perhaps followed by successful identification of a match). Defendants responded that multiple *attempts* do not amount to multiple *identifications*.

<u>(2) Analysis</u>

The specification discloses processes in which "there are two possible results: an identification has been made or no identification has been made." '849 Patent at 7:35–47; *see id.* at 9:32–35 ("The content ID result indicates either a reference corresponding to a particular piece

of content or indicates that no identification was made" (emphasis added)); *see also id.* at 9:46–51 ("supply missing identifications where the system has not otherwise been able to provide an identification"). In their briefing, the parties demonstrate agreement that a match may or may not be identified. Dkt. No. 80 at 6–7; Dkt. No. 87 at 6–7.

Claim 1 of the '768 Patent, for example, recites in relevant part (emphasis added):

> 1. A media measurement method comprising:
>
> (a) receiving over a network, at one or more computers, data for a sequence of audio data samples, the audio data samples comprising representations of audio data captured at a media monitoring device, the plurality of audio data samples being submitted over the network;
>
> (b) using the one or more computers to query an electronic database of a plurality of audio data representations and corresponding content identifiers;
>
> (c) generating a raw play stream, the raw play stream comprising a sequence of *content identification results corresponding to the sequence of audio data samples*; wherein:
>
> the sequence of *content identification results* is obtained by querying the electronic database to attempt to determine *respective* likely matches between *respective audio data samples* in the sequence of audio data samples and *respective audio data representations* in the electronic database;
>
> *a content identification result* of the sequence of *content identification results* comprises either: (i) a content identifier associated in the electronic database with a *respective audio data representation* that is determined to be a *respective likely match with a respective one of the audio data samples*; or (ii) an indication of the absence of a *respective* likely match between a *respective audio data sample* and an audio data representation in the electronic database;
>
> the raw play stream includes either: at least two different content identifiers obtained from the electronic database; or at least one content identifier obtained from the electronic database and at least one indication of the absence of a *respective* likely match between a *respective* audio data sample and an audio data representation in the electronic database; . . . .

The claim itself thus addresses whether an identification is or is not made, and Defendants' proposed construction does not preclude a failure of identification. *See* Dkt. No. 87 at 6–7.

As for Defendants' proposal of "respective," the extensive usage of the word "respective," such as in the above-reproduced portion of Claim 1 of the '768 Patent, weighs in favor of finding that the claim requires a one-to-one correspondence between data samples and content

identification results. The other independent claims of the '768 Patent and the '848 Patent are similar in this regard. *See* '768 Patent, Cls. 9; *see also* '848 Patent, Cls. 1, 9. Although Claims 1, 6, and 10 of the '622 Patent, Claims 1, 6, and 10 of the '849 Patent, and Claims 1 and 11 of the '911 Patent do not use the word "respective," those claims do use the word "corresponding." Also, as Plaintiff agreed at the March 18, 2025 hearing, the "content identification" terms here at issue should be interpreted consistently across this family of patents. *SightSound Techs. LLC v Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) ("Where multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents.") (citation and internal quotation marks omitted).

Also, to whatever extent the claim construction is based on, or redundant with, surrounding claim language, such construction is permissible and will assist the finder of fact in understanding these claims. *See 01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1296 (Fed. Cir. 2012) ("01 Communique has not cited, and we have not discovered, any authority for the proposition that construction of a particular claim term may not incorporate claim language circumscribing the meaning of the term.").

Plaintiff cites disclosures of embodiments that purportedly involve a "one-to-many relationship between the content identification results and the data samples," namely: "Play stream generator 126 generates a raw play stream relating a sequence of samples to content identification results"; and "Raw Play Stream 410 . . . relates that sequence to corresponding identification results in the content ID column." Dkt. No. 80 at 8 (quoting '849 Patent at 6:24–27 & 9:30–32). Each of these disclosures, however, involves a "stream" of multiple samples and involves "result*s*," plural. These disclosures therefore do not demonstrate a one-to-many relationship and thus are not inconsistent with finding that the disputed terms require a one-to-one relationship.

Moreover, other portions of the specification are consistent with this understanding. *See, e.g.,* '849 Patent at 11:35–37 ("Each content ID indicates an identifier of the content that has been identified as corresponding to the captured sample.").

At the March 18, 2025 hearing, Plaintiff also cited technical development documentation stating that "all matches for a segment are included in a single response." Dkt. No. 87, Ex. 16, Ex. A-3 at I.B.2.c (p. 83 of 115 of Ex. 16). Even assuming that this development documentation is evidence of the technical possibility of having multiple matches for a particular sample, the issued claims do not necessarily need to encompass that technical possibility. Rather, "[c]laim construction focuses primarily on the language of the claims." *See, e.g., Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1300 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d 1303). As discussed above, the claim language, informed by the specification, supports finding a one-to-one relationship between samples and results.

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| "content identification results" | **"identifications of respective data samples"** |
| "a content identification result" | **"an identification of a respective data sample"** |
| "content identifications" | **"identifications of respective data samples"** |

**B. "clean play stream"**

| **"clean play stream"**<br>('768 Patent, Claims 1, 5, 9, 13;<br>'848 Patent, Claims 1, 5, 9, 13) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary beyond plain and ordinary meaning.<br><br>Not indefinite (to the extent Samsung contends this term is indefinite). | "corrected sequence of content identification results corresponding to the sequence of [audio/video] data samples"<br><br>Alternatively, the term is indefinite. |

Dkt. No. 76 at 3; Dkt. No. 80 at 8; Dkt. No. 87 at 8; *see* Dkt. No. 95 at 17.

Shortly before the start of the March 18, 2025 hearing, the Court provided the parties with the following preliminary construction: "corrected sequence of content identification results corresponding to the sequence of [audio/video] data samples."

(1) The Parties' Positions

Plaintiff argues that "the claim language explains how a clean play stream is generated," and "explains that the clean play stream is an output generated based on results from scrubbing the raw play stream." Dkt. No. 80 at 8 & 9. Plaintiff argues that Defendants are attempting to import requirements from preferred embodiments. *Id.* at 9–10.

Defendants respond that "[d]isclosures from the specification explain that the type of changes made by 'scrubbing' would be to 'correct' a result in the sequence of content identification results that, based on an analysis of other data, was determined to be either missing or incorrect. Where no such correction is necessary, however, the clean play stream would be the same as the raw play stream." Dkt. No. 87 at 9 (citations omitted). Also, whereas Plaintiff argues the claim language recites how a "clean play stream" is generated, Defendants argue that "the claim language does not clarify *what* a clean play stream *is*." *Id.* at 10. Defendants argue that Plaintiff's

interpretation would "allow[] 'any' type of changes," which Defendants argue "would effectively remove any limitation whatsoever on the scope of this term, thereby rendering it indefinite." *Id.* at 11.

Plaintiff replies: "[N]othing in the intrinsic record mandates that every clean play stream consists of 'corrected' results from a raw play stream. In fact, the specification clarifies that scrubbing—which is the process described in the claims that takes a play stream from raw to clean—may encompass correcting any identifications '*or to supply missing identifications* where the system has not otherwise been able to provide an identification.'" Dkt. No. 89 at 2 (quoting '768 Patent at 9:32–37 (emphasis modified)). Plaintiff also argues that "the word 'correct' insinuates a requirement that the results be objectively accurate," and "patents do not ever suggest that the result of scrubbing is a clean play stream with objectively correct results." *Id.* at 2–3 (citation omitted). Further, Plaintiff argues that "a clean play stream could be created separately and populated with results, based on changes determined from the scrubbing step recited in the claims," and "[t]his is not, strictly speaking, a direct modification of the raw play stream." *Id.* at 3.

At the March 18, 2025 hearing, Plaintiff argued that the Court's preliminary construction improperly excludes supplying a missing identification and also excludes other types of data, such as metadata. Plaintiff proposed that, instead of referring to "corrected," the construction should refer to "scrubbed" or "scrubbed as claimed." Defendants responded that Plaintiff's proposals of "scrubbed" or "scrubbed as claimed" would create confusion, arguing that "scrubbed" has various different meanings in different contexts but does have a clear meaning in the context of these claims, which Defendants reiterated is "corrected." Defendants also responded that supplying a missing identification would be within the scope of the construction and, also, that the use of the word "corrected" does not imply objective correctness but rather merely refers to making a play

stream "more correct" from the perspective of the system. Defendants also submitted that if the system determines that no corrections are needed, then the "clean play stream" could be identical to the "raw play stream."

(2) Analysis

Claim 1 of the '768 Patent, for example, recites in relevant part (emphasis added):

> 1. A media measurement method comprising:
>
> (a) receiving over a network, at one or more computers, data for a sequence of audio data samples, the audio data samples comprising representations of audio data captured at a media monitoring device, the plurality of audio data samples being submitted over the network;
>
> (b) using the one or more computers to query an electronic database of a plurality of audio data representations and corresponding content identifiers;
>
> (c) generating a raw play stream, the raw play stream comprising a sequence of content identification results corresponding to the sequence of audio data samples;
>
> * * *
>
> (d) *scrubbing* the raw play stream by analyzing sample sequence data of the raw play stream *to determine whether to change a result of the sequence of content identification results* in view of a pattern of the sample sequence data of the raw play stream compared to an expected pattern of sample sequence data; and
>
> (e) generating a *clean play stream* from the raw play stream by making any *changes to the raw play stream that are determined to be made by the scrubbing*.

Of note, all of the claims here at issue recite "clean play stream" as being generated "from the raw play stream" by (emphasis added): "making any *changes* to the raw play stream that are determined to be made." *See* '768 Patent, Cls. 1, 5, 9, 13; *see also* '848 Patent, Cls. 1, 5, 9, 13. Also, the specification discloses:

> Play stream generator 126 generates a raw play stream relating a sequence of samples to content identification results (for an example of a portion of a raw play stream, see FIG. 3 and accompanying text). The raw play stream is then processed by play stream scrubber 127 which analyzes the sequence of sample identification results utilizing sequence data processing module 128. Based on analysis of sequence data and, where appropriate, analysis of audience data via interaction with audience data module 123, *play stream scrubber 127 generates a clean play stream* and clean play list (see FIG. 3 and accompanying text) which can then be used by measurement analysis module 129. Results of the media measurement analysis can be obtained via report generator 130.

’849 Patent at 6:24–37 (emphasis added).

> Step 301 prepares a play stream for further processing necessary for channel matching by scrubbing (i.e. reviewing for *missing or incorrect* data) the play stream using non-channel data. Step 302 prepares a play list for further processing necessary for channel matching by scrubbing (i.e. reviewing for *missing or incorrect* data) the play list using non-channel data.

*Id.* at 8:44–47 (emphasis added).

> Sample sequence data may be used to *“scrub”* Raw Play Stream 410. By analyzing the sequence of data on Raw Play Stream, it is possible to locate and *correct* any identifications that are likely to be *incorrect* or to *supply missing identifications* where the system has not otherwise been able to provide an identification.
>
> * * *
>
> Information about the sequence of content in a play stream can be used to generate a play list and identify a channel, and the identified channel data can also potentially be used to help further *“scrub”* a play stream. For example, the sequence of consumed content represented on Play Stream 450 is searched against known channel data (e.g. particular CD albums, broadcasts, or other particular storage or transmission media carrying a particular sequence of content). * * *
>
> With respect to further “scrubbing” the Raw Play Stream 410, in this example, channel data may be used to *correct* the apparent misidentification of sample 29.

*Id.* at 9:46–51, 9:66–10:7 & 10:20–22 (emphasis added); *see id.* at 9:51–65; *see also id.* at 10:29–33 (“[T]he user’s known consumption habits . . . [may provide] another basis . . . [to] *correct* [the] content ID for sample 29 of Play Stream 410.”) (emphasis added).

Because the claims distinguish between a “clean play stream” and a “raw play stream,” because the claims recite “*changes* to the raw play stream,” and because the specification provides context regarding “correct[ing]” identifications that are deemed to be “incorrect” (based on various information, such as based on surrounding identifications or based on information about an identified media channel), Defendants persuasively argue that a “clean” play stream is one that has been “corrected.” Although the above-discussed disclosures refer to “incorrect” identifications as

well as "missing" identifications, Defendants' proposal of "corrected" is understood as encompassing changing a missing identification as well as changing an incorrect identification, and nothing in the intrinsic record compels otherwise. Also, as Defendants confirmed at the March 18, 2025 hearing, "corrected" does not require any so-called "objective correctness" but rather refers to whatever a system or method deems to be correct (or at least, as Defendants suggested at the hearing, "more correct").

With that understanding, the Court hereby construes "clean play stream" to mean **"corrected sequence of content identification results corresponding to the sequence of [audio/video] data samples."**

### C. "raw play stream"

| **"raw play stream"**<br>('768 Patent, Claims 1, 3, 4, 9, 11, 12;<br>'848 Patent, Claims 1, 3, 4, 9, 11, 12;<br>'622 Patent, Claims 2, 3, 7, 8, 11, 12;<br>'849 Patent, Claims 2, 3, 7, 8, 11, 12) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary beyond plain and ordinary meaning.<br><br>Not indefinite (to the extent Samsung contends this term is indefinite). | "uncorrected sequence of content identification results corresponding to the sequence of [audio/video] data samples"<br><br>Alternatively, the term is indefinite |

Dkt. No. 76 at 3; Dkt. No. 80 at 10; Dkt. No. 87 at 11; Dkt. No. 95 at 24.

Shortly before the start of the March 18, 2025 hearing, the Court provided the parties with the following preliminary construction: "uncorrected sequence of content identification results corresponding to the sequence of [audio/video] data samples."

<u>(1) The Parties' Positions</u>

Plaintiff argues that "it serves no helpful purpose to restate language that is already recited within the context of the claim," and "Samsung's construction is unnecessary because it does nothing to clarify what jurors will already understand from this straightforward claim language." Dkt. No. 80 at 10 & 12 (citation omitted). Further, Plaintiff argues that "[w]hile, of course, the purpose of the scrubbing is to increase the accuracy of the results, ultimate 'correctness' is not a requirement of the claims." *Id.* at 12.

Defendants respond that "Samsung's proposed constructions draw on the claim language and language from the specification that explain what the otherwise undefined terms 'raw play stream' and 'clean play stream' mean," and "Samsung's proposals eliminate ambiguity, invoking the terms 'corrected' and 'uncorrected' to clarify the distinction between a 'raw play stream' and a 'clean play stream,' and what the 'scrubbing' process does." Dkt. No. 87 at 11 & 12.

Plaintiff replies by incorporating its arguments as to the term "clean play stream," which is addressed above.

At the March 18, 2025 hearing, Plaintiff urged that instead of referring to an "uncorrected" sequence, the proper construction should refer to a sequence "before scrubbing."

<u>(2) Analysis</u>

Claim 1 of the '768 Patent, for example, recites in relevant part (emphasis added):

> 1. A media measurement method comprising:
>
> * * *
>
> (c) generating a *raw play stream*, the *raw play stream* comprising a sequence of content identification results corresponding to the sequence of audio data samples;
>
> * * *
>
> (d) scrubbing the *raw play stream* by analyzing sample sequence data of the *raw play stream* to determine whether to change a result of the sequence of content identification results in view of a pattern of the sample sequence data of the *raw play stream* compared to an expected pattern of sample sequence data; and

> (e) generating a clean play stream from the *raw play stream* by making any changes to the *raw play stream* that are determined to be made by the scrubbing.

The specification discloses, for example:

> FIG. 4 illustrates *Raw Play Stream 410* generated by a process such as step 207 of FIG. 2; Clean Play Stream 450 and Clean Play List 490 *generated by a scrubbing step* such as step 209 of FIG. 2 or steps 301, 302, or 305 of FIG. 3; Channel Data 470 and Channel Data 490.
>
> * * *
>
> Sample sequence data may be used to 'scrub' Raw Play Stream 410. By analyzing the sequence of data on Raw Play Stream, it is possible to locate and *correct* any identifications that are likely to be incorrect *or to supply missing identifications* where the system has not otherwise been able to provide an identification.

'849 Patent at 9:25–29 & 9:46–51 (emphasis added).

As discussed regarding the term "clean play stream," which is a separate disputed term addressed above, the specification provides context that supports Defendants' proposal of construing the term "clean play stream" as being "corrected." *Id.* at 9:46–65, 9:66–10:7, 10:20–22 & 10:29–33. This evidence likewise supports Defendants' proposal of construing the term "raw play stream" as being "uncorrected."

Further, although Plaintiff argues that Defendants' proposal improperly excludes additional elements besides the "sequence of content identification results," the claims here at issue are open-ended "comprising" claims, which Defendants' proposal does not seek to alter. *See, e.g., Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.").

The Court therefore hereby construes "raw play stream" to mean **"uncorrected sequence of content identification results corresponding to the sequence of [audio/video] data samples."**

**D. "play list"**

| **"play list"**<br>('768 Patent, Claims 5, 13;<br>'848 Patent, Claims 5, 13;<br>'622 Patent, Claims 3, 8, 12;<br>'849 Patent, Claims 3, 8, 12) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary beyond plain and ordinary meaning.<br><br>Not indefinite (to the extent Samsung contends this term is indefinite). | "list of media content items including the period for which each media content item was played"<br><br>Alternatively, the term is indefinite |

Dkt. No. 76 at 3; Dkt. No. 80 at 13; Dkt. No. 87 at 13; *see* Dkt. No. 95 at 35–36.

Shortly before the start of the March 18, 2025 hearing, the Court provided the parties with the following preliminary construction: "list of media content that has been played."

(1) The Parties' Positions

Plaintiff argues: "The term 'play list' is used in a manner consistent with its plain and ordinary meaning: a list of items that have been, or will be, played. Every single juror will understand this term without further definition." Dkt. No. 80 at 13. Plaintiff argues that Defendants' proposal of "the period for which each media content item was played" should be rejected because it "takes an exemplary aspect of a preferred embodiment and imports it into the claims." *Id.* at 14.

Defendants respond that "construction of the term 'play list' is appropriate because all of the asserted claims in which the term appears are too vague to clarify its meaning." Dkt. No. 87 at 13. Defendants argue that "[t]he claims and specification are replete with references to 'media content items' and make clear that the entire focus of the alleged inventions is '*media content* recognition.'" *Id.* at 14 (citations omitted). Defendants also argue that "the evidence AMRH cites

shows that a 'play list,' as used in the patents, necessarily refers to content played in the *past*." *Id.* at 15. Further, Defendants submit that "the 'period for which each media content item was played' referred to in Samsung's proposal does not require log times or any other specific time(s) associated with when a media content item was played, as AMRH implies," but rather "[i]t contemplates something much simpler: a relation between played media content items, such as the order in which they were played." *Id.* at 15–16 (citations omitted). Finally, Defendants argue that Plaintiff is conflating "play list" with the "play stream terms," which Defendants argue is disfavored because different claim terms are presumed to have different meanings. *Id.* at 16–17.

Plaintiff replies that no construction is necessary and that Defendants' proposal "is not materially different from the ordinary understanding of jurors who use play lists of audio and video content in their everyday lives." Dkt. No. 89 at 4. Plaintiff also submits that "there is no dispute that the items in a play list represent audio and video content that have been identified by ACR," and "AMRH has never suggested (and does not intend to suggest) that a claimed play list would include future content." *Id.* at 5.

At the March 18, 2025 hearing, Plaintiff accepted the Court's preliminary construction. Defendants opposed the Court's preliminary construction. The parties rested on their briefing and presented no oral argument.

(2) Analysis

"[W]hen an applicant uses different terms in a claim it is permissible to infer that he intended his choice of different terms to reflect a differentiation in the meaning of those terms." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) (citations omitted). The specification likewise distinguishes between "play stream" and "play list," disclosing for example:

> Continuing with the description of FIG. 2, step 207 generates a raw play stream indicating a series of samples and corresponding identification results. Step 209 scrubs the raw play stream based upon sample sequence data (described further below in the context of FIGS. 3–4 and accompanying text) and based upon audience data. The resulting clean play stream may be converted to a *play list listing the content captured and indicating the order in which it was captured*.

’849 Patent at 8:13–21 (emphases added).

Also, Figure 5 distinguishes between “Clean Play List” 560 and “Clean Playstream” 510 and is reproduced here:

510

**Clean Playstream**

| row | log time | content ID | content offset |
|---|---|---|---|
| 1 | $t_0$ | TVprgm 27 | (0) |
| 2 | $t_0$+1 | TVprgm 27 | (0)+1 |
| 3 | $t_0$ +2 | none | n/a |
| 4 | $t_0$+3 | none | n/a |
| 5 | $t_0$+4 | none | n/a |
| 6 | $t_0$+5 | TVprgm 27 | (0)+2 |
| 7 | $t_0$+6 | TVprgm 27 | (0)+3 |
| 8 | $t_0$+7 | TVprgm27 | (0)+9 |
| 9 | $t_0$+8 | TVprgm27 | (0)+10 |
| 10 | $t_0$+9 | TVprgm27 | (0)+9 |
| 11 | $t_0$+10 | TVprgm27 | (0)+10 |
| 12 | $t_0$+11 | none | n/a |
| 13 | $t_0$+12 | TVprgrm27 | (0)+29 |
| 14 | $t_0$+13 | TVprgrm27 | (0)+30 |
| 15 | $t_0$+14 | ad23 | (0) |
| 16 | $t_0$+15 | none | n/a |
| 17 | $t_0$+16 | ad25 | (0)+2 |
| 18 | $t_0$+17 | TVprgm28 | (0) |
| 19 | $t_0$+18 | TVprgm28 | (0)+1 |
| 20 | $t_0$+19 | TVprgrm28 | (0)+2 |

560

**Clean Play List**

| row | start log time | end log time | content ID | content offset |
|---|---|---|---|---|
| 1 | $t_0$ | $t_0$+2 | TVprgrm27 | (0) |
| 2 | $t_0$+2 | $t_0$+5 | none | n/a |
| 3 | $t_0$+5 | $t_0$+7 | TVprgrm27 | (0)+2 |
| 4 | $t_0$+7 | $t_0$+9 | TVprgrm27 | (0)+9 |
| 5 | $t_0$+9 | $t_0$+11 | TVprgrm27 | (0)+9 |
| 6 | $t_0$+11 | $t_0$+12 | none | n/a |
| 7 | $t_0$+12 | $t_0$+14 | TVprgrm27 | (0)+29 |
| 8 | $t_0$+14 | $t_0$+15 | ad23 | (0) |
| 9 | $t_0$+15 | $t_0$+16 | none | n/a |
| 10 | $t_0$+16 | $t_0$+17 | ad25 | (0)+2 |
| 11 | $t_0$+17 | $t_0$+20 | TVprgrm28 | (0) |

570

**Channel Data for TV C4**

| row | start time | end time | content ID |
|---|---|---|---|
| 1 | C(0) | C(0)+31 | TVprgrm27 |
| 2 | C(0)+31 | C(0)+34 | ad23 |
| 3 | C(0)+34 | C(0)+37 | ad24 |
| 4 | C(0)+37 | C(0)+40 | ad25 |
| 5 | C(0)+40 | C(0)+50 | TVprgrm28 |

590

**Clean Play List with Deduced Actions**

| row | log time | end log time | content ID and <deduced action> | content offset |
|---|---|---|---|---|
| 1 | $t_0$ | $t_0$+2 | TVprgrm27 | (0) |
| 2 | $t_0$+2 | $t_0$+5 | <pause for 3 units> | n/a |
| 3 | $t_0$+5 | $t_0$+7 | TVprgrm27 | (0)+2 |
| 4 | $t_0$+7 | $t_0$+7 | <skip frwrd 5 units> | n/a |
| 5 | $t_0$+7 | $t_0$+9 | TVprgrm27 | (0)+9 |
| 6 | $t_0$+9 | $t_0$+9 | <skip bckwrd 2 units> | n/a |
| 7 | $t_0$+9 | $t_0$+11 | TVprgrm27 | (0)+9 |
| 8 | $t_0$+11 | $t_0$+12 | <fast frwrd 18 units> | n/a |
| 9 | $t_0$+12 | $t_0$+14 | TVprgrm27 | (0)+29 |
| 10 | $t_0$+14 | $t_0$+15 | ad23 | (0) |
| 11 | $t_0$+15 | $t_0$+16 | <fast frwrd 7 units> | n/a |
| 12 | $t_0$+16 | $t_0$+17 | ad25 | (0)+2 |
| 13 | $t_0$+17 | $t_0$+20 | TVprgrm28 | (0) |

**FIG. 5**

In this Figure, the “Play List” sets forth a list of content, and the “Playstream” sets forth a list of content identifications as identified for each sample. *See, e.g.,* ’849 Patent at 12:5–10 (“row 1 and row 2 of Play Stream 510 are . . . collapsed into a single row (row 1) . . . because the content offset progression . . . suggests continuous consumption of the same piece of media content”).

These disclosures, as well as the recitals of "content" throughout the claims, support Defendants' proposal that a "play list" is a list of "content."

Defendants also assert that the construction of "play list" should refer to "media" because the patents-in-suit all frame the claimed inventions in the context of media, namely "audio" or "video." Dkt. No. 87 at 14. Plaintiff agrees. Dkt. No. 89 at 5 ("[T]here is no dispute that the items in a play list represent audio and video content that have been identified by ACR.").

The parties also agree that the term "play list" does not require specifying, for example, the time of day when media content was played, and this understanding is consistent with the extrinsic dictionary definitions cited by the parties. *See* Dkt. No. 87, Ex. 11, *American Heritage Dictionary* 1347 (4th ed. 2000) ("[a] list of musical selections for broadcast or performance"); *id.*, Ex. 12, *New Oxford American Dictionary* 1309 (2001) ("a list of recorded songs or pieces of music chosen to be broadcast on a radio show or by a particular radio station").

Defendants' proposal of referring to a "period" or an "order" in which media content was played, however, relates to specific features of particular disclosed embodiments that should not be imported into the claims. *See* '849 Patent at 8:13–21; *see also Phillips*, 415 F.3d at 1323. Also, Defendants' proposal of "item" would tend to confuse rather than clarify the scope of the claims. Referring to "media content" is sufficiently clear in the context of these claims.

The Court therefore hereby construes "play list" to mean **"list of media content that has been played."**

**E. "in view of a pattern of the sample sequence data of the raw play stream compared to an expected pattern of sample sequence data"**

| **"in view of a pattern of the sample sequence data of the raw play stream compared to an expected pattern of sample sequence data"**<br>('768 Patent, Claims 1, 9;<br>'848 Patent, Claims 1, 9) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary beyond plain and ordinary meaning.<br><br>Not indefinite (to the extent Samsung contends this term is indefinite). | "considering a pattern of the sample sequence data of the raw play stream including the result compared to a pattern of content identification results moments before and after the result"<br><br>Alternatively, the term is indefinite |

Dkt. No. 76 at 4; Dkt. No. 80 at 15; Dkt. No. 87 at 17; *see* Dkt. No. 95 at 37–38.

Shortly before the start of the March 18, 2025 hearing, the Court provided the parties with the following preliminary construction: "in view of a pattern of the sample sequence data of the raw play stream compared to an established pattern of sample sequence data."

(1) The Parties' Positions

Plaintiff argues that "[n]either the claims nor the specification provides support for [Defendants'] narrowed interpretation," and Plaintiff argues that Defendants' proposal "takes an easily understood phrase and makes it more complicated." Dkt. No. 80 at 17.

Defendants respond that their proposed construction "mirrors the exact language used by the inventors in statements made regarding the meaning of the claims, including recently," and "[a]ny confusion regarding the claimed comparison is a consequence of the ambiguity of the claim language itself, not Samsung's proposed construction." Dkt. No. 87 at 17.

Plaintiff replies that the patentee's prosecution statements regarding conception cannot amount to a disclaimer. Dkt. No. 89 at 6 (citation omitted).

At the March 18, 2025 hearing, Plaintiff accepted the Court's preliminary construction. Defendants opposed the Court's preliminary construction. The parties rested on their briefing and presented no oral argument.

<u>(2) Analysis</u>

Claim 1 of the '768 Patent, for example, recites in relevant part (emphasis added):

> 1. A media measurement method comprising:
>
> * * *
>
> (c) generating a raw play stream, the raw play stream comprising a sequence of content identification results corresponding to the sequence of audio data samples;
>
> * * *
>
> (d) scrubbing the raw play stream by analyzing sample sequence data of the raw play stream to determine whether to change a result of the sequence of content identification results *in view of a pattern of the sample sequence data of the raw play stream compared to an expected pattern of sample sequence data*; and
>
> (e) generating a clean play stream from the raw play stream by making any changes to the raw play stream that are determined to be made by the scrubbing.

Plaintiff's opening brief includes an annotated version of portions of Figure 4, which illustrates such changes:

**410**

**Raw Play Stream**

| row | log time | content ID |
|---|---|---|
| 1 | $t_0$ | song 51 |
| 2 | $t_0+1$ | none |
| 3 | $t_0+2$ | song51 |
| 4 | $t_0+3$ | song51 |
| 5 | $t_0+4$ | movie 81 |
| 6 | $t_0+5$ | song51 |
| 7 | $t_0+6$ | song51 |

**450**

**Clean Play Stream**

| row | log time | content ID |
|---|---|---|
| 1 | $t_0$ | song 51 |
| 2 | $t_0+1$ | song51 |
| 3 | $t_0+2$ | song51 |
| 4 | $t_0+3$ | song51 |
| 5 | $t_0+4$ | song51 |
| 6 | $t_0+5$ | song51 |
| 7 | $t_0+6$ | song51 |

The specification discloses, for example:

> Given this pattern of sample sequence data, it is reasonable to assume that the person using the corresponding monitor listened to song51 through the time period associated with the audio data of samples 1–7, and thus, the "scrubbed" version of

> the play stream, i.e. Clean Play Stream 450, indicates song51 for each of samples 1-7.

’849 Patent at 9:60–65.

This disclosure of comparing a sample to neighboring samples, however, is an example, and Defendants’ do not persuasively show that the claim language precludes considering non-neighboring samples and other information. Rather, the claim language merely requires comparing a sampled pattern to an “expected pattern.” This expectation could be based on nearby samples or could be based, for example, on a particular user’s usual listening habits:

> Audience data may also be used in the “scrubbing” process. For example, if “song81” is radically different from the user’s known consumption habits and “song35” is within the user’s known consumption habits, another basis might be provided for suspecting that “song35” rather than “song81” is the correct content ID for sample 29 of Play Stream 410.

’849 Patent at 10:44–50.

To whatever extent Defendants maintain that “expected” is subjective and amorphous and, therefore, is indefinite, Defendants do not persuasively demonstrate any lack of “reasonable certainty” by clear and convincing evidence. *Nautilus*, 134 S. Ct. at 2129. Unlike the *DDR Holdings* case cited by Defendants, this does not depend “depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention.” *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260 (Fed. Cir. 2014) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)). Rather, the surrounding claim language and the specification provide context for understanding the phrase “expected pattern” as referring to an established pattern. *See, e.g.,* ’849 Patent at 9:60–65 & 10:44–50 (reproduced above).

Further, Defendants' proposal of "moments before and after" is based, in part, on United States Provisional Patent Application No. 60/574,836 ("the '836 Provisional"), to which the '768 Patent claims priority and which discloses:

> Sequence Filter: Determine the most likely match result(s) for a particular time sample based on the match results for *proximate* time samples, and use this (along with other filters) to determine if the match result for that particular time sample is likely to be inaccurate and if so, alter the match result.

Dkt. No. 87, Ex. 20, '836 Provisional at 4 (emphasis added).

Defendants do not persuasively demonstrate that the claimed invention should be limited, as a matter of claim construction, to the disclosure of the provisional application. *Cf. Sycamore IP Holdings LLC v. AT&T Corp.*, No. 16-CV-588, 2017 WL 1045949 (E.D. Tex. Mar. 16, 2017) (Bryson, J., sitting by designation) ("While it may or may not be the case that new matter was added to the non-provisional application, that is an issue that goes to the priority date to which the . . . patent is entitled; it does not govern the construction of the . . . patent, at least with respect to terms the meaning of which is clear in the non-provisional application that issued as the . . . patent. * * * . . . [T]he result would be the denial of priority to the date of the provisional application, not a construction of the . . . patent that is contrary to what is clearly conveyed by the claims and specification of that patent.").

Also, the named inventors stated, in an affidavit during *ex parte* reexamination of the '768 Patent:

> 15. With respect to the conception support for claim elements 1(d) and (e), the cited evidence of Exhibit A-4 describes a method of scrubbing the raw play stream for errors *using the results of samples moments before and after the sample being considered*. This scrubbing was to adjust any inaccuracies (such as, for example, replacing any incorrect or missing matches with correct matches) and improve the identification of monitored content. Therefore, the discussion of scrubbing implicitly teaches the replacement of improper or missed matches in the raw playstream with correct values determined by the scrubbing. That this was a

> purpose of the scrubbing is evidenced by the example clean play stream in Exhibit A-6, which predates February 26, 2004.

Dkt. No. 87, Ex. 16, Sept. 11, 2024 Declaration Under 37 CFR § 1.131 at ¶ 15 (emphasis added); *see also id.*, Ex. 17, Response to June 11, 2024 Office Action at 11 ("For elements 1(d) and (e), support is provided by at least 'Scrubbing System' that 'compar[es] that which was monitored in a particular moment with that which was monitored in the time prior to and following it, i.e. at any particular moment of monitoring, look at the context of what was monitored before and after to determine which of possible recognitions is most likely to be correct.' Exhibit A-4, p. 1."); *id.*, Ex. 19, Sept. 11, 2024 Hoarty Decl. at p. 18 ("The 'Sequence Filter' is applied to create the 'clean' playstream by comparing the sequence of results of the raw playstream with the sequence of results of sample data already stored within the database. In so doing, the Sequence Filter is 'scrubbing' the raw play stream based on an expected pattern of sample sequence data."); *id.* at pp. 19–20.

Defendants do not, however, cite any authority demonstrating that "swear behind" statements such as this (regarding conception and reduction to practice) can be relied upon to find a disclaimer or disavowal that would narrow the scope of the claims. Indeed, the patentees' statements relate to the state of their development efforts rather than to the scope of the claims or to any purported distinctions between the claims and any prior art. *See* Dkt. No. 87, Ex. 16, Sept. 11, 2024 Declaration Under 37 CFR § 1.131 at ¶ 2 ("This declaration is to provide evidence to show that the invention recited in claims 1–2, 5–7, 9–10 and 13–15 of the '768 patent was conceived by us on a date prior to February 26, 2004 and that we exercised reasonably continuous diligence in attempting to reduce the invention to practice from that date to May 27, 2004.").

The Court therefore hereby expressly rejects Defendants' proposed construction. The Court also hereby expressly rejects Defendants' alternative indefiniteness argument. *See, e.g., Sonix*, 844 F.3d at 1377.

The Court hereby construes "in view of a pattern of the sample sequence data of the raw play stream compared to an expected pattern of sample sequence data" to mean **"in view of a pattern of the sample sequence data of the raw play stream compared to an established pattern of sample sequence data."**

**F. "at one or more computers," "using the one or more computers," and "by the one or more computers"**

| **"at one or more computers"<br>"using the one or more computers"<br>"by the one or more computers"**<br>('389 Patent, Claim 1;<br>'911 Patent, Claims 1, 11) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary beyond plain and ordinary meaning.<br><br>Not indefinite (to the extent Samsung contends this term is indefinite). | These terms must have the same meaning in each instance that they appear in the claims.<br><br>Alternatively, the term is indefinite. |

Dkt. No. 76 at 4–5; Dkt. No. 80 at 18; Dkt. No. 87 at 21; *see* Dkt. No. 95 at 44–45.

Shortly before the start of the March 18, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [at least one of the 'one or more computers' must satisfy all of the claim limitations]"; and "The antecedent basis for 'the one or more computers' is set forth in the recital of 'at one or more computers.'"

(1) The Parties' Positions

Plaintiff argues that "[t]here is nothing confusing or difficult to understand about these claim terms that needs to be construed," and "[i]t is unclear what Samsung hopes to accomplish with its instruction, other than to manufacture an argument that the claim cannot be infringed if

different computers within the set of one or more computers perform different steps of the claim." Dkt. No. 80 at 18.

Defendants respond that "the claims' use of '*the* one or more computers' means that the same 'one or more computers' that perform earlier functions in the claim must also perform the later functions." Dkt. No. 87 at 22; *see id.* at 21–22.

Plaintiff replies that it "does not dispute that the later reference to 'the one or more computers' refers back to the initially recited 'one or more computers.'" Dkt. No. 89 at 7. Plaintiff argues: "[I]n a patent that recites several steps performed by 'one or more computers,' some steps may be performed by computer C1, other steps by C2, and the remaining steps by C3. In this scenario, all three computers C1, C2, C3 may collectively constitute 'one or more computers,' and thus read on the claim limitations even if no single computer performs all claim steps." *Id.*

At the March 18, 2025 hearing, Plaintiff reiterated its arguments and also cited, for example, disclosure in the specification regarding using a "distributed computing network." *See* '911 Patent at 14:62–15:4.

<u>(2) Analysis</u>

Claim 1 of the '389 Patent, for example, recites (emphasis added):

> 1. A media measurement method comprising:
>
> receiving, *at one or more computers*, audio data from a monitoring device, the audio data being divisible into samples; and
>
> determining, *using the one or more computers*, a next sample of the audio data for attempted identification of a media content item corresponding to the next sample by adjusting a length of a time window of the next sample based at least in part upon a result of an attempt *using the one or more computers* to identify a first prior sample as corresponding to a media content item stored in a computerized database of reference content; wherein, if the attempt to identify the first prior sample indicates a result that is different than a result of an attempt to identify a second prior sample, then the time length window of the next sample is changed relative to a time window of the first prior sample.

On one hand, the specification discloses that "the present invention may be *distributed* over multiple computers, such as, for example, over the computers of a distributed computing network." '849 Patent at 15:2–5 (emphasis added). "Samsung does not dispute that the invention may involve multiple computers." Dkt. No. 87 at 22.

On the other hand, the claim uses the definite article, "the," and "the use of 'the' . . . indicates the claimed term refers to an antecedent term." *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 974 (Fed. Cir. 2023).

Plaintiff contends that "different computers within the set of one or more computers [can] perform different steps of the claim." Dkt. No. 80 at 18. Plaintiff asserts that what the parties have is a dispute regarding infringement rather than regarding claim construction. *Id.* (citing *Raytheon Co. v. Indigo Sys. Corp.*, 682 F. Supp. 2d 717, 728 (E.D. Tex. 2010).

*Finjan* is analogous and demonstrates that the present dispute is a matter of claim construction. *See* 84 F.4th at 974. *Finjan* found that "the subsequent references to 'the computer' can only be satisfied by the same "one or more computers" that satisfied the first limitation." *Id.* Likewise, in above-reproduced Claim 1 of the '389 Patent, "using *the* one or more computers" refers back to the recital of "at one or more computers," such that the claim limitations involve the same "one or more computers" throughout the claim. Claims 1 and 11 of the '911 Patent are similar in this regard (citing "at one or more computers" and "by *the* one or more computers").

Finally, *Finjan* noted that the recital of "a computer" was equivalent to "one or more computers," and *Finjan* explained that "[e]ven if an infringing system can use 'one or more computers,' the plain language of the claims requires at least one of those computers to perform all the functions listed in the claims . . . ." *Id.* at 975. Plaintiff argues that *Finjan* is distinguishable because here the claims initially recite "one or more computers" rather than "a computer" (Dkt.

No. 89 at 8), but because *Finjan* explained that the recital of "a computer" was equivalent to "one or more computers," the Court reaches the same conclusion here, namely that at least one of the "one or more computers" must satisfy all of the claim limitations that refer to "one or more computers" and "the one or more computers." *See* 84 F.4th at 974–75.

With that understanding, the Court hereby construes these disputed terms as set forth in the following chart:

| <u>Term</u> | <u>Construction</u> |
|---|---|
| "at one or more computers" | **Plain meaning** |
| "using the one or more computers" | **The antecedent basis for "the one or more computers" is set forth in the recital of "at one or more computers."** |
| "by the one or more computers" | **The antecedent basis for "the one or more computers" is set forth in the recital of "at one or more computers."** |

**G. "media measurement report"**

| **"media measurement report"**<br>('849 Patent, Claims 1, 6, 10) | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary beyond plain and ordinary meaning.<br><br>Not indefinite. | Indefinite |

Dkt. No. 76 at 5; Dkt. No. 80 at 19; Dkt. No. 87 at 22; *see* Dkt. No. 95 at 47.

Shortly before the start of the March 18, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning."

(1) The Parties' Positions

Plaintiff argues that "[t]he term 'media measurement report' is clear and definite on its face," and "[w]hen read in light of the specification and prosecution history, it informs those skilled in the art with reasonable certainty on how the invention generates a 'media measurement report' and the scope of the measured media in the report." Dkt. No. 80 at 19. Plaintiff submits that "'[m]edia measurement' is explained throughout the specification . . . ." *Id.* at 20 (citations omitted). Further, Plaintiff submits that this term was added by an examiner amendment during prosecution, and Plaintiff argues that an examiner amendment is presumed not to introduce indefiniteness into a claim. *Id.* at 21.

Defendants respond that "'media measurement report' is undefined, appears nowhere in the specification, and has no meaning to a POSITA." Dkt. No. 87 at 23 (citation omitted). Defendants argue that the specification disclosures cited by Plaintiff "state generically that what is measured or tracked is 'usage' of content or what content is 'utilized,' but they provide no insight as to the ways content may be 'utilized' that would be tracked or what 'usage' refers to, how that is done, which measured or tracked information would be included in a 'media measurement report,' or how it would be presented in such a report." *Id.* at 23–24 (citation omitted). Defendants also argue that "[t]he prosecution history likewise fails to define 'media measurement report.'" *Id.* at 26. As for the examiner amendment, Defendants argue that "[w]hile it is true that an examiner's amendment is presumed not to have introduced an indefinite term, this is merely a presumption, and the examiner's provided reasons are relevant to the analysis," and "little can be gleaned from the record about the examiner's reasoning, but the evidence suggests the examiner had in mind concerns other than resolving indefiniteness when amending the claims." *Id.* at 26 & 27.

Plaintiff replies that "[t]here is ample disclosure within the specification and prosecution history for a POSITA to understand what the claimed media measurement reports are," and "Samsung cannot meet its clear and convincing burden by isolating the disputed term and ignoring the rest of the claim language." Dkt. No. 89 at 9. Plaintiff also submits that Defendants acknowledge the presumption that an examiner amendment does not introduce indefiniteness and that Defendants cite no authority for finding that a purported lack of explanation by the examiner can rebut the presumption. *Id.* at 10.

At the March 18, 2025 hearing, Defendants urged that "media measurement report" is boundless and that the patent provides no guidance regard what is in the "report." Plaintiff responded by citing the opinion of its expert that generating reports regarding media consumption is well-established in the relevant art.

(2) Analysis

Claim 1 of the '849 Patent, for example, recites (emphasis added):

> 1. A media measurement method comprising:
>
> using one or more computers to generate a play stream of content identification results corresponding to a sequence of data samples, the data samples comprising representations of video data captured at a media monitoring device, wherein content identifiers of the play stream's content identification results are obtained by using corresponding data samples to search a computerized database of known content;
>
> in response to obtaining the content identifiers, using one or more computers to utilize a sequential order of at least two different obtained content identifiers in the play stream to identify a channel corresponding to the data samples, the at least two different obtained content identifiers identifying different media content items; and
>
> using one or more computers to utilize an identified channel corresponding to the data samples to generate a *media measurement report*.

Defendants emphasize that the claims do not specify the content of a "media measurement report." In this regard, Defendants' expert opines for example that "[a] 'media measurement report' . . . could apparently include any information about anything related to media, and could

be presented in any form, including text, graphics, audio, video, any combination of these, or none of these, and neither the claims nor the intrinsic evidence offer guidance to establish any limits as to what may or must be included—or may not or must not be included—in a 'media measurement report.'" *See* Dkt. No. 80, Ex. 14, Jan. 13, 2025 Bederson Decl. at ¶ 31.

Plaintiff argues that "[i]t makes sense[] that tracking the media consumption[] would lead to a report of the results of that tracking," and Plaintiff cites, for example, disclosure regarding what Plaintiff refers to as "media consumption patterns used to construct targeted content." Dkt. No. 80 at 20 (citing '849 Patent at 5:21–36).

The Background section of the specification states:

> Traditional media measurement systems have focused on directly monitoring channels being utilized by audience members. However, as media consumption patterns have become more complex, channel-centric media measurement is inadequate for many purposes. It may be desirable to track usage of particular media content independent of channel. Furthermore, although "channel" identification in a traditional media measurement system may sometimes be limited to radio or television broadcast station, it is increasingly desirable to track usage of media across several types of media delivery vehicles including radio, television, CD, DVD, computer download, portable media players (e.g. MP3 players, iPod), and other vehicles. Furthermore, with respect to tracking consumption of advertisements, it may be inadequate to simply track channel tuning, because, for example, an audience member may mute a broadcast during commercial periods. Thus simply identifying a broadcast channel does not adequately track whether the audience member listened to a particular advertisement.

'849 Patent at 1:22–39. The Detailed Description of the specification discloses that "[r]esults of the media measurement analysis can be obtained via report generator 130." '849 Patent at 6:35–37; *see id.* at Fig. 1 ("Report generator 130").

The specification does not explicitly disclose the contents of a media measurement "report," but Plaintiff's expert opines that, "[a]t a very high level, all of these claims recite functionality for obtaining a result relating to media measurement and utilizing that result to generate a media measurement report," and "the phrase 'media measurement' was commonly

understood to mean the practice of collecting data on media consumption in order to report insights into audience behavior." Dkt. No. 80, Ex. 13, Jan. 13, 2024 Hoarty Decl. at ¶¶ 27 & 28; *see id.* at ¶¶ 26–33.

Also, during prosecution of the '896 Patent, which is no longer asserted but which is related (the '849 Patent resulted from a continuation of the '896 Patent), the Examiner added the term "media measurement report" by an Examiner Amendment. Dkt. No. 80, Ex. 15, Notice of Allowability. This Examiner Amendment is presumed not to have given rise to indefiniteness. S*ee Tinnus Enters., LLC v. Telebrands Corp.*, No. 2017-1726, 733 F. App'x 1011, 1020 (Fed. Cir. May 30, 2018) ("we presume that an examiner would not introduce an indefinite term into a claim when he/she chooses to amend the claim for the very purpose of putting the application in a condition for allowance") (citation omitted); *see also Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1367 (Fed. Cir. 2022) (reversing finding of indefiniteness, noting that "[t]he [district] court did not discuss the Examiner's Amendment"); *see also Sonix*, 844 F.3d at 1380 ("Although Appellees are correct that application by the examiner and an expert do not, on their own, establish an objective standard, they nevertheless provide evidence that a skilled artisan did understand the scope of this invention with reasonable certainty."). This Examiner Amendment is also noted in the prosecution history of the '849 Patent. *See id.*, Ex. 24, Amendment Under 37 CFR § 1.111, at 6.

Defendants emphasize that the examiner's remarks do not discuss this term, instead noting that "[t]he Examiner proposed amending the independent claims to overcome a rejection under 35 USC 101 and to place the claims in condition for allowance" (Dkt. No. 87, Ex. 21, Dec. 18, 2019 Examiner-Initiated Interview Summary), but Defendants do not demonstrate that this absence of specific remarks warrants setting aside the presumption.

On balance, Defendants do not meet their burden to show indefiniteness by clear and convincing evidence. *See, e.g., Sonix*, 844 F.3d at 1377. Although the question of indefiniteness should not be resolved by considering merely whether the individual words of the term are reasonably clear, the word "report" is reasonably clear in the context of these claims as a whole, particularly as used in the context of an "identified channel." Moreover, the above-cited opinions of Plaintiff's expert, combined with the term at issue having been introduced by an Examiner Amendment, as noted above, weigh further against indefiniteness. The opinions of Defendants' expert in this regard are unpersuasive and do not overcome the presumption against indefiniteness. *See* Dkt. No. 80, Ex. 14, Jan. 13, 2025 Bederson Decl. at ¶¶ 30–40. The term "media measurement report" is broad, but "[b]readth is not indefiniteness." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017).

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed construction, and no further construction is necessary.

The Court hereby construes "media measurement report" to have its **plain meaning**.

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 24th day of March, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE