IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

ANONYMOUS MEDIA RESEARCH          )   CAUSE NO. 2:23-CV-439-JRG
HOLDINGS, LLC.,                   (
                                  )
          Plaintiff,              (
                                  )
vs.                               (
                                  )
SAMSUNG ELECTRONICS CO., LTD.,    (
et al.,                           )   MARSHALL, TEXAS
                                  (   SEPTEMBER 26, 2025
          Defendants.            )   8:30 A.M.
_____


VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE
and a jury

_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

A P P E A R A N C E S

FOR THE PLAINTIFF:    AHMAD, ZAVITSANOS &
                      MENSING, PLLC
                      1221 McKINNEY ST., SUITE 2500
                      HOUSTON, TEXAS  77010
                      (713) 655-1101
                      BY: MR. JASON McMANIS
                          MR. WEINING BAI

                      THE McCARTY FIRM, PC
                      100 CRESCENT COURT, FLOOR 7
                      DALLAS, TEXAS  75201
                      (214) 459-3196
                      BY:  MR. WARREN McCARTY

                      MILLER FAIR HENRY, PLLC
                      1507 BILL OWENS PARKWAY
                      LONGVIEW, TEXAS  75604
                      (903) 757-6400
                      BY:  MS. ANDREA FAIR

FOR THE DEFENDANTS:   PAUL HASTINGS, LLP - CHICAGO
                      71 SOUTH WACKER DRIVE
                      45TH FLOOR
                      CHICAGO, ILLINOIS  60606
                      (312) 499-6000
                      BY:  MR. ROBERT UNIKEL

                      PAUL HASTINGS, LLP -
                      SAN DIEGO
                      4655 EXECUTIVE DR., SUITE 350
                      SAN DIEGO, CA 92121
                      (858) 458-3000
                      BY:  MS. ARIELL BRATTON

                      PAUL HASTINGS, LLP -
                      SAN FRANCISCO
                      101 CALIFORNIA ST., FLOOR 48
                      SAN FRANCISCO, CA 94111
                      (415) 856-7000
                      BY:  MR. MATTHIAS KAMBER

                      GILLAM & SMITH, LLP
                      7232 CROSSWATER AVENUE
                      TYLER, TEXAS  75703
                      (903) 934-8450
                      BY:  MR. TRAVIS UNDERWOOD

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                      100 E. HOUSTON STREET
                      MARSHALL, TEXAS  75670
                      (903) 923-8546

1036

THE COURT:  Be seated, please.

Counsel, is there anything I need to hear from you on before I bring in the jury and proceed to give them the Court's final instructions followed by your closing arguments?

MR. UNIKEL:  Yes, Your Honor.  We did have one issue to raise about potentially sealing the courtroom.  As I spoke with opposing counsel about it this morning, if they're going to display the revenue and profit numbers, that is something that we've been treating as confidential throughout the trial.

We don't want to disrupt their presentation in any way, so we wanted to try and figure out how to deal with that in advance.  We also don't want to have the inventors have to leave.  So what I think we would like to propose is some sort of sealing the record if we can, but allowing the inventors to stay for purposes of the closing arguments.

I don't know if there's another way Your Honor would like to deal with it.

THE COURT:  Well, it's the parties' confidential information.  And to the extent both sides can come to some accommodation and agreement, then I'm not going to probably stand in the way of that.

I will tell you that in the past I have had counsel request to turn off the monitors in the gallery, and I can -- I do have that ability, I think, to turn off the monitors in the gallery but they would stay on on counsel

table.

That's not going to necessarily shield the inventors from seeing what's on the monitors at counsel table, but it would give you some level of protection with regard to whoever might be in the gallery.

MR. UNIKEL:  I think that would be a fine solution with one caveat.  I think part of the concern is having the numbers be read into the public record so that they would be accessible on the transcript afterwards.  And if we can seal the record and turn off the monitors for that portion, that might be a fine compromise.

THE COURT:  Well, let me ask you this.  Rather than formally sealing the record, would it be feasible to not seal the record but simply let the parties move for redaction of those precise numbers before the transcript becomes public?

MR. UNIKEL:  I think that would be fine, Your Honor. Thank you.

MR. McCARTY:  That would be perfect for the Plaintiff.

THE COURT:  I would rather do that.  Then we don't have the entirety of the transcript sealed; we just have the precise numbers you want to protect.

MR. UNIKEL:  Understood.  Thank you, Your Honor.

THE COURT:  All right.  Now, at this juncture, let me ask, are counsel prepared to read into the record any items

1038

from the list of pre-admitted exhibits used during yesterday's portion of the trial?

MR. BAI:  Yes, Your Honor.

Your Honor, may it please the Court.  On September 25th, 2005, admitted into the record by Defendants, DTX 20, DTX 24.

THE COURT:  All right.  Any objection from Defendants?

MR. UNDERWOOD:  No, Your Honor.

THE COURT:  Do Defendants have a similar rendition to offer?

MR. UNDERWOOD:  We do not.

THE COURT:  All right.  Thank you, counsel.

MR. UNDERWOOD:  Thank you.

MR. BAI:  Thank you.

THE COURT:  Do we have all of our jurors here, Mr. Estess?

THE COURT SECURITY OFFICER:  Yes, Your Honor.

THE COURT:  All right.  Is there anything else, counsel, I need to hear you on before I bring the jury in.

MR. McMANIS:  Nothing from the Plaintiff, Your Honor.

MR. UNIKEL:  Nothing from the Defendant, Your Honor.

THE COURT:  All right.  Now, let me ask this. Mr. McManis, you did indicate yesterday you and Mr. McCarty were going to divide the Plaintiff's closing argument.  Do you

1039

know how you're going to do that, who's going first, who's going second, how long the first one wants to take, et cetera?

MR. McMANIS:  Yes, Your Honor.  Mr. McCarty will do the front half or I guess more than half, but about 25 minutes.  We'll reserve 15 for rebuttal, and I will do the rebuttal.

THE COURT:  All right.  I have had counsel do that same thing.  And by the time the second lawyer got up, there was about two minutes left.

MR. McMANIS:  I recognize the risk I'm taking, Your Honor.

THE COURT:  All right.  Anything further?

I will say this to those not only inside the bar but particularly those in the gallery:  The Court considers its final instructions on the law and counsels' closing arguments to be the most serious part of a very serious process.  Consequently, I don't want any disruptions during this proceeding.

If you have a device that is capable of making a sound, either take it outside the courtroom, make sure at your own risk that it's off, or do something to disable it.  If you need to pass papers back and forth, if you need to whisper to your neighbor, do all of that before I bring the jury in.

I want everybody silent quiet and respectful without any disruptions during the entirety of the Court's delivery of its

final instructions to the jury and counsels' closing arguments.

All right?  With that understanding, let's bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Welcome back, ladies and gentlemen. Please have a seat.

Ladies and gentlemen of the jury, you've now heard all the evidence in this case, and I'm now going to instruct you on the law that you must apply.

I want you to be clear, you're each going to have your own printed individual copy of these final jury instructions that I'm giving you orally at this time.  You'll be able to refer to that printed copy when you retire to the jury room if you so desire, so there's really no particular reason for you to take notes during my oral delivery of these instructions unless you just particularly want to.

It's your duty to follow the law as I give it to you.  On the other hand, and as I've told you previously, you, the jury, are the sole judges of the facts in this case.  Do not consider any statement that I have made over the course of the trial or may make in the course of these final instructions as an indication that I have any opinion about the facts in this case.

Now, you're about to hear closing arguments from the

1041

attorneys for the competing parties.  Statements and arguments of the attorneys, ladies and gentlemen, are not evidence, and they are not instructions on the law.  They're intended only to assist you, the jury, in understanding the evidence and the parties' competing contentions.

A verdict form has been prepared for you, and you will take this verdict form with you when you retire to the jury room.  And when you have reached a unanimous decision as to the answers to the questions in that verdict form, you will have your foreperson fill in those unanimous answers in the blanks in the questions in the verdict form, have your foreperson date the document and sign it on the last page, and then advise the Court Security Officer that the jury has reached a verdict.

Answer each question as directed in the verdict from the facts as you find them to be.  Do not decide who you think should win this case and then answer the questions to reach that result.  One more time, your answers to the questions in the verdict form and your verdict as a whole must be unanimous.

Now, in determining whether any fact has been proven in this case you may, unless otherwise instructed, consider the testimony of all the witnesses, regardless of who may have called them, and you may consider all the exhibits presented and received into evidence during the trial, regardless of who

1042

may have presented them or produced them.

Now, some of the testimony that you heard during this trial was translated from Korean to English.  In consideration of a witness' testimony, it is not relevant whether his or her testimony was in English or translated into English from another language.  You should consider the translated substance of the testimony in the same way as you would consider testimony originally given in English.

Remember, you, the jury, are the sole judges, the sole judges of the credibility and believability of all the witnesses and the weight and effect to give to all of the evidence.

Now, in deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You alone are to determine questions of credibility or truthfulness of the witnesses.  And in weighing the testimony of the witnesses, you may consider the witness' manner and demeanor on the witness stand, any feelings or interest they may have in the outcome of the case, any bias or prejudice about the case that the witness might have, and the consistency or inconsistency of their testimony, considered in the light of the circumstances.

Has the witness been contradicted by other evidence?  Has he or she made statements at other times and other places that are contrary to what they said on the witness stand?  You,

ladies and gentlemen, must give the testimony of each witness the amount of credibility and weight that you believe it deserves.

And you must keep in mind as well that a simple mistake does not mean that a witness is not intentionally telling the truth.  You must consider whether any misstatement was an intentional falsehood or rather a simple lapse in memory, and what significance, if any, should be attached to that testimony.

Now, unless I instruct you otherwise, you may properly determine that the testimony of a single witness is sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the evidence you believe that single witness.

As I've previously told you, ladies and gentlemen, the attorneys in this case are acting as advocates for their competing parties and the parties' competing claims, and they have a duty to raise objections when they believe evidence is offered that should not be admitted under the rules of the Court.

When the Court has sustained an objection to a question addressed to a witness, you must disregard that question entirely and you may not draw any inference from its wording or guess or speculate about what the witness would have said if the Court had permitted them to answer the question.

On the other hand, if the objection was overruled by the Court, then you are to treat the answer to the question and the question itself just as if no objection had been made--that is, like any other question and answer.  Now, by allowing the testimony or other evidence to be introduced over the objection of an attorney, the Court, in so doing, did not indicate any opinion as to the weight or effect of that evidence.

Also, at times during the trial, it's been necessary for the Court to talk with the lawyers either here at the bench or when you are outside of the courtroom; in other words, to talk to the lawyers outside of your hearing.  This happens because there are things that arise during trials that do not involve the jury.  You should not speculate or guess, ladies and gentlemen, about what was said during any such discussions that took place outside of your presence or your hearing.

Now, during the course of the trial, you may have been shown certain documents with portions of those documents blacked out or redacted.  In those situations, you should not speculate about what was redacted or why it was redacted. Those redactions you should understand were approved by the Court prior to when the trial began.

Also, certain testimony has been presented to you during this case through what are called depositions.  A deposition is the sworn, recorded answers to questions asked of a witness

in advance of the trial.  If a witness cannot be present to testify in person or if the rules of procedure otherwise permit, then the witness' testimony may be presented under oath in the form of a deposition.

Before the trial began, the attorneys representing the competing parties questioned these deposition witnesses under oath.  At that time, the witnesses were sworn, a court reporter was present, and they were asked questions by counsel and they answered those questions.  And all of that was transcribed and taken down.  In many cases it was recorded with video equipment.

You should give the testimony of deposition witnesses, ladies and gentlemen, the credibility and the amount of importance and weight that you believe it deserves.  And you should to the best of your ability consider deposition testimony just as if the witness had testified before you in person in open court.

Now, while you should consider only the evidence in this case, I want you to understand, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.

Let me say that another way.  You, ladies and gentlemen, may make deductions that reason and common sense lead you to draw from the facts that have been established through the testimony and evidence in this case.  However, you should not

base any of your decisions on evidence not presented by the parties in open court during the trial, including your own personal experiences, if any, with the particular products that might be at issue in this case.

Now, there are two types of evidence that you may properly consider in finding the truth as to the facts in this case.  One is direct evidence, such as the testimony of an eyewitness.  The other is indirect evidence, also called circumstantial evidence--that is, the proof of a chain of circumstances that indicates the existence or non-existence of certain other facts.  As a general rule, the law makes no distinction between direct evidence and circumstantial evidence, but simply requires that you, the jury, find the facts in this case based on all of the evidence presented, both direct and circumstantial.

Now, the parties may have stipulated or agreed to some facts in this case, and when the lawyers for both sides stipulate as to the existence of a fact, you must, unless otherwise instructed, accept that stipulation as evidence and regard that fact as proven.

Certain exhibits have been shown to you during the trial that were illustrations.  We call these types of exhibits demonstrative exhibits, or simply demonstratives for short. Demonstrative exhibits, ladies and gentlemen, are a party's picture, illustration, or model to describe something involved

07:39    in the trial.  If your recollection of the evidence differs from the demonstratives, then you should rely on your recollection.

The demonstrative exhibits, ladies and gentlemen, are not evidence, but a witness' testimony during which a demonstrative was used is evidence.  Let me be clear.  Demonstrative exhibits will not be available for you to review or consider during your deliberations in the jury room.

07:40    Now, when knowledge of a technical subject may be helpful to you, the jury, a person who has special training or experience in that particular technical field, called an expert witness, is permitted to state his or her opinions on those technical matters to the jury.  However, you're not required to accept those opinions.  As with any other witness, it is solely up to you to decide whether or not to rely on what's presented.

07:40    Now, any patent holder has the right to file a suit in a United States District Court and has the right to seek a trial by jury, if it believes that the patent rights that it holds are being infringed.  However, you should make no inference from the fact that a suit was filed or brought to trial in this case.  A patent owner is entitled to protect his rights under the laws of the United States, and that includes bringing a suit in a United States District Court seeking money damages based on allegations of patent infringement.

1048

By the same token, ladies and gentlemen, a defendant is equally entitled to defend itself under the laws of the United States, and this includes bringing any and all of its available defenses under the law in a trial in a United States District Court.  You are to consider this suit as a dispute between two equal parties and render your verdict based solely on the evidence presented during the trial.

In any legal action, facts must be proven by a required amount of evidence known as the burden of proof.  The burden of proof in this case is on the Plaintiff Anonymous Media for some issues and on the Defendants, the Samsung Defendants, for other issues.  And there are two burdens of proof that you will apply in this case, as we've already discussed.  These are the preponderance of the evidence and clear and convincing evidence.

Anonymous Media has the burden of proving patent infringement by a preponderance of the evidence.  Anonymous Media also has the burden of proving damages for any patent infringement by a preponderance of the evidence.  A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true. Sometimes this is talked about as being the greater weight and degree of credible testimony.

Now, the Samsung Defendants have the burden of proving patent invalidity by clear and convincing evidence.  Clear and

convincing evidence means evidence that produces in your mind an abiding conviction that the truth of the party's factual contentions is highly probable.  Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion and proof than is necessary for the preponderance of the evidence standard.

Now, these two burdens of proof, as I've already mentioned to you, are not to be confused with a third and altogether different burden of proof which you're aware of called beyond a reasonable doubt.  That is the burden of proof applied in a criminal case, and it has no application whatsoever in a civil case such as this.  Beyond a reasonable doubt is a higher burden of proof than clear and convincing evidence, and clear and convincing evidence is a higher burden of proof than the preponderance of the evidence standard.

Now, in determining whether any facts have been proven in this case by a preponderance of the evidence or by clear and convincing evidence, you may, unless otherwise instructed, consider the stipulations of the parties, the testimony of all the witnesses, regardless of who may have called them, and all the exhibits received into evidence during the trial, regardless of who may have presented or produced them.

Now, as I did at the beginning of the case, I'm now going to give you a summary of each party's contentions, and I'll

then provide you with detailed instructions on what each side must prove to win on each of its contentions.

As you're aware, this case concerns two separate United States patents asserted by the Plaintiff Anonymous Media against the Samsung Defendants.  These patents are United States Patent No. 10,719,848, which you've heard referred to throughout the trial as the '848 Patent.  The second U.S. patent at issue in this case is United States Patent No. 10,963,911, which you've heard continuously referred to throughout the trial as the '911 Patent.  You might have hard it called the '911 Patent.  And I'll refer to these two patents as the patents-in-suit, and I may also refer to them and you may hear them also called the asserted patents.

Now, Anonymous Media contends that Samsung, the Samsung Defendants, have infringed the patents-in-suit by making, using, importing, selling, or offering for sale in the United States the Samsung automatic content recognition system, known as the ACR system.  Sometimes in these instructions I'll refer to this system accused of infringement as the Samsung ACR system or simply as the accused system.

Now, Anonymous Media contends that the accused system infringes the following claims of its two patents, claims 1, 5, 9, and 13 of the '848 Patent; and claim 1 of the '911 Patent.  These claims are referred to and you'll hear referred to as the asserted claims.  Anonymous Media, the Plaintiff,

contends that the accused system infringes the asserted claims.

Anonymous Media contends that it is entitled to money damages in the form of a reasonable royalty for Samsung's alleged infringement.  Anonymous Media has the burden of proof on these issues by a preponderance of the evidence.

Now, the Samsung Defendants deny that the accused system infringes any of the asserted claims of the '848 or the '911 Patents.  Samsung denies that it owes Anonymous Media any damages, any money damages in this case.

Samsung further contends that the asserted claims of the patents-in-suit, the '848 Patent and the '911 Patent, are invalid because they are anticipated and/or because they are obvious.  Samsung has the burden to prove invalidity by clear and convincing evidence.

Invalidity, ladies and gentlemen, is a defense to infringement.  Invalidity and infringement, however, are separate and distinct issues.  And your job is to decide whether Samsung has infringed any of the asserted claims and whether those claims are invalid.  If you decide that any claim has been infringed and is not invalid, then you'll need to decide what amount of money damages, if any, to be awarded to Anonymous Media to compensate it for the infringement you have found.

Now, several times in these instructions I'll refer to

1052

and you'll hear me refer to a person of ordinary skill in the field of the invention, or a person of ordinary skill in the art.  It is up to you, ladies and gentlemen, to decide the level of ordinary skill in the field of the invention.

In deciding this level of ordinary skill in the field, you should consider all the evidence introduced during the trial, including but not limited to:

1.  The levels of education and experience of the inventors and other persons actively working in the field;

2.  The types of problems encountered in the field;

3.  Prior art solutions to those problems;

4.  The rapidity with which innovations are made; and

5.  The sophistication of the technology.

A person of ordinary skill in the art is a hypothetical person who is presumed to be aware of all the relevant prior art at the time of the claimed invention.

Now, before you can decide many of the issues in this case, you'll need to understand the role of the patent claims.

The claims of the patent are those numbered sentences at the end of the patent.  The claims define the Plaintiff's rights under the law.  The claims are important, ladies and gentlemen, because it is the words of the claims themselves that define what the patent covers.  The figures and the text in the rest of the patent provide a description or example of the invention, and they provide a context for the claims, but

it is the claims themselves that define the patent's coverage.

Therefore, what a patent covers depends, in turn, upon what each of its claims covers.  And each claim is effectively treated as if it were its own separate patent, and each claim may cover more or may cover less than any other claim.  So what a patent covers collectively or as a whole depends upon what each of its claims covers.

And you'll first need to understand what each claim covers in order to decide whether or not there is infringement of that claim and to decide whether or not that claim is invalid.  And the first step is to understand the meaning of the words used in the patent claim.  Now, the law says that it's my role as the judge to define the terms of the claims, but it's your role as the jury to apply my definitions or constructions to the issues that you're asked to decide in this case.

Accordingly, and as I explained at the beginning of the trial, I've already determined the meaning of certain language from the asserted claims, and I've provided you with the Court's definitions of that language in your jury notebooks.  And you can consider and review those claim constructions or definitions in your jury notebooks during your deliberations.  However, you must accept my definitions of those words from the claims as being correct, and it's your job to take these definitions or constructions that I have supplied and apply

them to the issues that you are deciding, including the issues of infringement and invalidity.  As I noted, these definitions or constructions are included in your juror notebooks, and you may refer to them during your deliberations.

To be simple, ladies and gentlemen, you may refer to anything in your juror notebooks during your deliberations, including the patents-in-suit, these constructions or definitions, and everything else in those notebooks.

Now, you should disregard any evidence presented at the trial that contradicts or is inconsistent with the definitions or constructions of the claim language that the Court has given you.  For any particular claim language, however, where the Court did not define or construe it for you, you're to use and apply the plain and ordinary meaning of that term or that language as understood by one of ordinary skill in the art, which is to say, in the field of the technology of the patent at the time of the alleged invention.

Now, the meaning of the words in the patent claims must be the same when deciding the issues of infringement and when deciding the issues of invalidity.

Now, the claims are intended to define in words the boundaries of the inventor's rights.  Only the claims of a patent can be infringed.  Neither the written description nor the drawings in the rest of the patent can be infringed.  Now, each claim must be considered individually.

1055

I'll now explain to you how a claim defines what it covers.  A claim sets forth, in words, a set of requirements in a single sentence.  If a product, device, system, or method satisfies each of the requirements in that sentence, then it is covered by and infringes that claim.  And there can be several claims in a patent, and one claim may be narrower or broader than another claim by setting forth more or fewer requirements.  As I've told you, the coverage of a patent is assessed and determined on a claim-by-claim basis.

Now, in patent law, the requirements of a claim are often referred to and you may have heard them referred to during the trial as the claim elements or the claim limitations.

When a system meets all the requirements of a claim, that is, the system meets each of the claim's limitations or all of the claim elements, that claim is said to cover that system, and that system is said to fall within the scope of that claim.  In other words, a claim covers a system where each of the claim elements or limitations is present in that product.  And if a system is missing even one limitation or element of a claim, the system is not covered by that claim.  And if the system is not covered by the claim, the system cannot infringe the claim.

Now, this case involves two types of patent claims, ladies and gentlemen.  They are independent claims and dependent claims.  An independent claim does not refer to any

other claim within the patent.  It is independent.  An independent claim sets forth all the requirements that must be met in order to be covered by the claim.  And it is not necessary to look to any other claim within the patent to determine what an independent claim covers.

On the other hand, a dependent claim does not itself recite all the requirements of the claim, but refers to another claim or claims for some of its requirements.  In this way, the dependent claim depends from another claim.

A dependent claim incorporates all the requirements of the claim or claims from which it depends, or as it's sometimes said, from which it refers, as well as the additional requirements set forth within the dependent claim itself.  So to determine what a dependent claim covers, it's necessary to look at both the dependent claim and any other claim to which it refers or from which it depends.  A system that meets all the requirements of both the dependent claim and the claim or claims to which it refers or from which it depends is covered by that claim and, thus, infringes that dependent claim.

Now, taking the '848 Patent as an example, claim 1 of the '848 Patent is an independent claim, but claim 5 of the '848 Patent is a dependent claim that refers back to and is dependent upon claim 1.  Therefore, dependent claim 5 includes all the requirements of claim 1 as well as all of the

requirements within claim 5 itself.  I hope that example is helpful.

I'll now instruct you on infringement in more detail.  If a person or a corporation makes, uses, sells, or offers for sale within the United States, or imports into the United States what is covered by a patent claim without the patent holder's permission, then that person or corporation is said to infringe the patent.

To determine whether or not there is infringement, keep in mind, ladies and gentlemen, that only the claims of a patent can be infringed.  And you must compare the asserted patent claims as I may have defined some of the language within them, to the accused instrumentalities.  You should not compare the accused instrumentalities with any specific example set out in the patent or with the prior art in reaching your decision on infringement.

In deciding infringement, remember, the only correct comparison is between the accused products, sometimes called the accused instrumentalities, and the language of the asserted claims themselves as the Court may have defined or construed it.

You must reach your decision on each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented by both of the parties over the

1058

course of the trial.

I'll now instruct you on the specific rules that you must follow to determine whether the Plaintiff Anonymous Media has proven by a preponderance of the evidence that the Samsung Defendants have infringed one or more of the asserted patent claims involved in this case by making, using, selling, offering for sale, or importing the accused products within or into the United States.

In order to prove direct infringement by literal infringement, Anonymous Media must prove by a preponderance of the evidence, that is, that it's more likely than not, that the Samsung Defendants made, used, sold, offered for sale within, or imported into the United States a product or a system that meets all of the requirements of a claim, and they did so without the permission of the patent holder Anonymous Media during the time that the asserted patent was in force. You must compare the product or system with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met.

A claim element is literally present if it exists in the accused product as it is described in the claim language consistent with the claim constructions I have given you or if I did not give you claim construction definitions, then according to its plain and ordinary meaning as understood by a person of ordinary skill in the art.

1059

You must determine whether or not there is infringement separately for each asserted claim.  If any element recited in a claim is not found in an accused product or system, then you must find that particular product or system does not infringe that particular claim.  But if an accused product or system has each and every one of the claim limitations, infringement of that claim is shown even if the product contains additional features or elements that are not required by the claim.

Now, you must decide separately for each asserted claim whether or not there is infringement.  However, if you find that an independent claim on which other claims depend is not infringed, then there cannot be infringement of any dependent claim that refers to or depends from that independent claim.

On the other hand, if you find that an independent claim has been infringed, you must still go on to separately decide whether the product meets the additional requirements of any dependent claim that depends from or refers to that independent claim.  As I've said, a dependent claim includes all the requirements of the claims to which it refers or depends, plus the additional requirements set forth in the dependent claim itself.

Now, a patent can be directly infringed even if the alleged infringer did not have knowledge of the patent and without the infringer knowing that what it was doing constitutes infringement of a claim.

1060

I'll now instruct you on the rules that you must follow in deciding whether or not the Samsung Defendants have proven by clear and convincing evidence that the asserted claims of the patents are invalid.  Patent invalidity, as I've said, ladies and gentlemen, is a defense to patent infringement.  Invalidity and infringement are separate and distinct issues that must be separately and distinctly decided by you, the jury.

Now, an issued United States patent is accorded a presumption of validity based on the presumption that the U.S. Patent and Trademark Office, which you've heard called simply the PTO or the Patent Office, acted correctly in issuing the patent.  This presumption of validity extends to all issued United States patents.  In order to overcome this presumption of validity, the Samsung Defendants must establish by clear and convincing evidence presented in court that the asserted claims are invalid.  Therefore, you, the jury, must determine whether Samsung has proved that the Plaintiff's asserted claims are invalid.

Like infringement, ladies and gentlemen, invalidity is determined and decided on a claim-by-claim basis.  You must determine separately for each claim whether that claim is invalid.  If one claim of a patent is invalid, this does not necessarily mean that any other claim within the patent is invalid.  You must apply the claim language consistently and

in the same manner for the issues of infringement and for the issues of invalidity.

Now, at times you will hear references and you have heard references to the prior art.  A previous device, system, method, publication, patent, or patent application that predates the claimed invention is generally called prior art.

Prior art may include items that were publicly known or that had been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.  Prior art also includes the knowledge or use of an invention by a person of ordinary skill in the art in the United States prior to the date of invention.

Where Samsung is relying on prior art that was not considered by the Patent and Trademark Office during its examination, you may consider whether that prior art is significantly different and more relevant than the prior art that the Patent Office did consider.  If you decide it is different and more relevant, you may weigh that prior art more heavily when considering whether the challenger has carried its clear and convincing evidence burden of proving invalidity.

Now, in deciding the issue of validity, the only correct comparison, ladies and gentlemen, is between the prior art and the language or limitations of the asserted claims.  It is

improper to compare the prior art to the accused products or the accused instrumentalities.

I'll now instruct you on how you can determine whether any of the accused -- excuse me, whether any of the asserted claims from the asserted patents might be invalid as being anticipated.  For someone to be entitled to a patent, the invention must actually be new.  In general, inventions are not new when the identical product, method, or process has been made, used, or disclosed before.

Samsung contends that the asserted claims of the '848 Patent are invalid because the claimed invention is not new.  In other words, Samsung contends that the asserted claims are anticipated by the prior art.  Anticipation requires that all of the requirements of a patent claim be disclosed in a single prior art reference.  Also, the single prior art reference must disclose each and all of the elements for the claim arranged or combined in the same way as in the claim that -- and in the same way as the claim as the claim may have been construed or interpreted by the Court.

Samsung must prove by clear and convincing evidence that an asserted patent claim was anticipated by the prior art reference.  Anticipation, ladies and gentlemen, must be determined on a claim-by-claim basis.

To anticipate the invention, the prior art does not have to use the same words as the claim, but all of the

requirements of the claim must have been disclosed, either expressly or implied, to a person of ordinary skill in the art in the technology of the invention, so that looking at that one prior art reference, that person could make and use the claimed invention.

An item of prior art may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference.  Keep in mind, ladies and gentlemen, the only correct comparison for anticipation is between the single prior art reference and the language of the asserted claims as the Court may have construed or interpreted them.

Samsung may not establish anticipation by arguing that the accused products or instrumentalities practice the prior art, or by comparing the accused products or instrumentalities to a prior art reference.

To determine whether the Seet Patent application anticipates the applicable claims of the patents-in-suit, you must determine whether the portion of the application relied on is supported by that application's provisional patent application.  Samsung has the burden to show that the Seet Patent application is prior art.

Samsung contends in this case that the asserted claims of the '848 Patent and the '911 Patent are invalid as being

obvious.  I'll now instruct you on how to determine whether or not a claim -- an asserted claim is invalid as being obvious.

Even though a claimed invention may not have been identically disclosed or identically described in a single prior art reference before it was made by the inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology to which the claimed invention pertains at the time the inventions were made.

Samsung may establish that a patent claim is invalid by proving, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art at the time the invention was made in the field of the invention.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of the invention that someone would have had at the time the invention was made, the scope and content of that prior art, and any differences between the prior art and the claimed invention.

Be careful not to use hindsight, ladies and gentlemen; consider only what was known at the time of the invention.  In other words, you should not consider what a person of ordinary skill in the art would know today or what has been learned from the teachings of the asserted patent.

Keep in mind that the existence of each and every element of the claimed invention in the prior art does not necessarily prove obviousness.  Most, if not all, inventions rely on the building blocks of prior art.  Now, in determining whether a patent is invalid because of obviousness, you must consider the scope and content of the prior art as a whole, the differences between the prior art and the claimed invention, and the level of ordinary skill in the art.

In considering whether a claimed invention was obvious, you should consider whether, as of the effective priority date of the asserted patent, there was a reason that would have prompted a person of ordinary skill in the field to combine the known elements in a way that the claimed invention does, taking into account such facts as:

1.  Whether the claimed invention was merely the predictable result of using prior art references according to their known function;

2.  Whether the claimed invention provides an obvious solution to a known problem in the relevant field;

3.  Whether the prior art teaches or suggests the desirability of combining elements in the claimed invention, such as where there is a motivation to combine;

4.  Whether the prior art teaches away from combining elements in the claimed invention;

5.  Whether it would have been obvious to try the

combinations of elements in the claimed invention, such as where there is a design need or market pressure to solve a problem and there are a finite number of identified predictable solutions; and

6.  Whether the combination was prompted by design incentives or market forces.

Now, to find the invention obvious, you must find that a person of ordinary skill in the art would have had a reasonable expectation of success in combining the teachings of the prior art to result in the claimed invention.

In making these determinations, a person of ordinary skill uses simple common sense and can rely on the inferences and creative steps that a person of ordinary skill in the art would employ.

Also, ladies and gentlemen, Samsung does not need to show that one of ordinary skill would actually have combined the physical structures of two references, as long as it would have been obvious to a person of ordinary skill in the art to combine the teachings at the time of the invention.

In determining whether the claimed invention was obvious, do not use hindsight.  In other words, you should consider only what a person of ordinary skill in the art would know at the time of the asserted patent's priority date.

Now, in making these assessments, you should account for any objective evidence, sometimes called secondary

considerations, that may have existed at the time of the invention and afterwards that may shed light on whether or not the claimed invention is obvious.  The following are possible secondary considerations, but it's up to you to decide whether secondary considerations of non-obviousness exist at all. These are:

1.  Whether the claimed invention was commercially successful as the result of the merits of the claimed invention (rather than as the result of the design needs or market pressure advertising or similar activities);

2.  Whether the invention satisfied a long-felt need;

3.  Whether others had tried and failed to make the claimed invention;

4.  Whether others invented the claimed invention at roughly the same time;

5.  Whether others copied the claimed invention;

6.  Whether there were changes or related technologies or market needs contemporaneous with the claimed invention;

7.  Whether the claimed invention achieved unexpected results;

8.  Whether others in the field praised the invention;

9.  Whether persons having ordinary skill in the art of the invention expressed surprise or disbelief regarding the claimed invention;

10.  Whether others sought or obtained rights to the

patent from the patent holder; and

11.  Whether the inventor proceeded contrary to accepted wisdom in the field.

In determining whether the claimed invention was obvious, consider each claim separately, but understand that if a dependent claim is obvious -- excuse me, if an independent claim is obvious, then the claims from which it depend are necessarily obvious as well.

Now, for commercial success or any other secondary consideration to be evidence of non-obviousness, there must be a nexus between the patented features of the invention and the commercial success of the device.  The Plaintiff Anonymous Media has the burden of establishing this connection or nexus.

In support of obviousness, you may also consider whether others independently invented the claimed invention before or at about at the same time as the named inventor thought of it.

If you find that Samsung's accused products, accused instrumentalities, infringed any of the asserted claims and that the asserted claim is not invalid, then you must consider what amount of damages to award to Anonymous Media for that alleged infringement.

I'll now instruct you about the measure of damages, ladies and gentlemen, but by instructing you on damages, I am not suggesting which party should win this case on any issue. If you find that Samsung has not infringed any of the asserted

claims or that all of the asserted claims are invalid, then Anonymous Media is not entitled to any money damages.

If you award damages, they must be adequate to compensate Anonymous Media for any infringement which you have found. You should not include any additional amount in a damages award for the purpose of punishing Samsung or for the purpose of setting an example. Anonymous Media in this case has the burden to establish the amount of its damages by a preponderance of the evidence.

Now, the patent laws specifically provide that damages for infringement may not be less than a reasonable royalty. The Plaintiff Anonymous Media must prove the amount of its damages with reasonable certainty, but need not prove them with mathematical precision. And you may not award damages that are speculative or damages that are only possible, or damages that are based on guesswork. Anonymous Media seeks damages in this case in the form of a reasonable royalty.

And a reasonable royalty is defined as the money amount Anonymous Media and Samsung would have agreed to in a hypothetical negotiation as a fee for Samsung's use of the invention at the time just prior to when Samsung's alleged infringement began. You must consider this date for each of the asserted patent claims.

Now, in considering this hypothetical negotiation, you should focus on what the expectations of Anonymous Media and

Samsung would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the asserted claims were valid and infringed, and that both parties were willing to enter into an agreement.

The reasonable royalty that you determine must be a royalty that would have resulted from this hypothetical negotiation and not simply a royalty that either party would have preferred.  In the context of the hypothetical negotiation, it is not necessarily the case that each valid and infringed patent in the hypothetical negotiation contributes equally to the amount that Samsung would pay for that license or that each patent covered by other licenses that were presented contributes equally to the amount that was paid for those licenses.

The law requires that any damages awarded to the Plaintiff correspond to the value of the alleged invention within the accused system, as distinct from other, unpatented features of the accused product or system, or other factors such as marketing or advertising, or the Plaintiff's size or market position.  This is particularly true where the accused product has multiple features and multiple components not covered by the patent or where the accused product works in conjunction with other non-patented items.

Therefore, ladies and gentlemen, the amount you find as

damages, if any, must be based on the value attributable to the patented technology only.  If the unpatented features contribute to an accused product, you must then apportion that value to exclude any value attributable to unpatented features.  You must determine the appropriate royalty rate and the appropriate royalty base that reflect the value attributable to the patented invention alone.  Anonymous Media bears the burden to establish the amounts attributable to the patented features.

In determining a reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began.  Some of the kinds of factors that you may consider in making your determination are as follows:

1.  The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty.

2.  The rates paid by the licensee for the use of other patents comparable to the patents-in-suit.

3.  The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.  The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under

special conditions designed to preserve that exclusivity.

5.  The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory in the same line of business.

6.  The effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales.

7.  The duration of the asserted patents and the term of the license.

8.  The established profitability of the product made under the accused patents, its commercial success, and its currents popularity.

9.  The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10.  The nature of the patented invention, the character of the commercial embodiment of it as owned or produced by the licensor, and the benefits to those who have used the invention.

11.  The extent to which the infringer has made use of the invention and any evidence probative of the value of that use.

12.  The portion of the profit or of the selling price

that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.  The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.  The opinion testimony of qualified experts.

15.  The amount that a licensor (such as Anonymous Media) and a licensee (such as Samsung) would have agreed upon at the time the infringement began if both had been reasonably and voluntarily trying to reach an agreement--that is, the amount which a prudent licensee who desired as a business proposition to obtain a license to manufacture and sell a particular article embodying the patented invention would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a prudent patentee who was willing to grant a license.

Now, you may have heard these factors referred to during the trial, ladies and gentlemen, as the *Georgia-Pacific* factors.  No one of these factors is dispositive, and you can and you should consider the evidence that's been presented to you during the trial on each of these factors.

You may also consider any other factors which, in your minds, would have increased or decreased the royalty Samsung

would have been willing to pay and the patent owner Anonymous Media would have been willing to accept, with both acting as normally prudent businesspeople.

Comparable license agreements are one factor that may inform your decision as to the proper amount and form of the reasonable royalty award, similar to the way in which the value of a house is determined relative to comparable houses sold in the same neighborhood.  If a license agreement is not sufficiently comparable, you may not rely on it in determining damages.

Whether a license agreement is comparable to the license under the hypothetical license scenario depends on many factors, such as whether they involve comparable technologies, comparable economic circumstances, comparable structure, and comparable scope.  If there are differences between a license agreement and the hypothetical license, you must take those into account when you make your reasonable royalty determination.

In considering the evidence of a reasonable royalty, you are not required to accept one specific figure or another for the reasonable royalty.  You are entitled to determine what you consider to be a reasonable royalty based on your consideration of all the evidence presented by the parties whether that evidence is of a specific figure or a range of figures.

Now, with regard to the '848 Patent, the damages period begins on July the 21st, 2020, and ends on May the 26th, 2025.

With regard to the '911 Patent, the damages period begins on March the 30th, 2021, and ends on May the 26th, 2025.

Now, with these instructions, ladies and gentlemen, we will proceed to hear closing arguments from the attorneys in the case.

The Plaintiff may present its first closing argument to the jury at this time.

Would you like a warning on the time you've used, Mr. McCarty?

MR. McCARTY:  Yes, if I may, Your Honor.  So I'd like a five-minute warning after 20 minutes.

THE COURT:  You want me to warn you when you've used 25 minutes?

MR. McCARTY:  When I've used 20 minutes.

THE COURT:  20 minutes?

MR. McCARTY:  Yes, sir.

THE COURT:  All right.  I'll warn you when you've used 20 minutes.  You may begin with the first Plaintiff's closing argument.

MR. McCARTY:  Thank you.

Ladies and gentlemen, on Monday we met for the first time during jury selection.  Ms. Fair told you and I'll tell you again now, we are very grateful to be in front of you

presenting this case and we thank you for your service.

You know, I asked Mr. Otto last night as I was preparing for this closing, Is there any evidence I forgot?  Is there something you want me to say to you, the jury last arguments you want to get in before they deliberate?

And he looked at me, and he just said, you know, just tell them thank you for me.

And so that I do right by him, thank you.

Now, you were told right off the bat that it's going to be like drinking from a fire hose, and I think that the last four or five days have probably beared that out.  This case has some complicated facts, complicated evidence.  We've got patents and play streams, royalty rates.  We've got financial reports, we have fingerprint technology.

But let's not forget the simple truth for where this all started at the heart of this case is a very special company founded by two very humble inventors who created some incredibly useful technology that actually has had an impact on the world.  It may feel like weeks ago now, but just Monday you heard from these inventors.  You heard the testimony about how this brilliant product engineer with degrees in product design and engineering teamed up with a Ph.D. in communication.  Together they took the chance of a lifetime. They had everything going for them.

They were well-known experts in this industry with

experience in the field in software, multimedia, and research. And they left their corporate jobs, both with young families on the way, and they did what we all realize is a good thing--they started something based on a vision that had the potential to change the world.

What was their vision?  They wanted to use ACR technology to perform media measurement.  That terminology is probably something you've never heard before you came into this courtroom, but it turns out to be a pretty big deal these days.  It makes sense.  Right?  We find ourselves watching our shows on TV, we're on our phones all the time streaming music and streaming videos.  It's a part of our life.

But here's the thing about what they were trying to do: They wanted to do it ethically.  Do you remember this?  They wanted -- the whole point of this was to get participants who would willingly agree to participate in panels, earn a little money doing so, do a research project.  And they would measure the media consumption of these willing participants in an upfront, safe, ethical way.  And it helps make the shows we watch better, it helps make the advertisements that we get delivered to us more targeted, it helps the media that we consume get better in our daily lives.

You heard at first it wasn't easy.  There were ahead of their time on the technology.  Mr. Otto explained some investor meetings where he got laughed out of the room for

telling the investors that in the future, you are going to be watching videos on you phone. People didn't think that way back then. But, of course, we know what happened. They were right.

Mr. Otto testified about the long nights in their office, the piles of papers stacked up, working on their engineering, working on their computer software trying to design this product and build this company. And guess what? They proved out their vision. It worked. You saw how they developed that whole system. They designed the computer code. They built the computer. They outfitted the entire database to serve as the reference database.

But you-all remember the story, don't you? There was a component that didn't work, not well at all, and it was that Auditude component in the top right corner. What were the problems? Mr. Otto explained them to you. He showed you how the Auditude/MusiKube system that they were using, it was kind of a mess. Right? They picked it because it was the cheap option, it was free and they could use it to help build their prototype.

But in a twist of irony or maybe a blessing, it was because they chose to use that basic ACR system in that top right corner, the free Auditude product that had those problems, that they had their lightbulb moment. They rolled up their sleeves when they encountered those problems and they

got to work on the real engineering, and that led to the important innovations in this case?

You-all remember seeing these output files from the Auditude system filled with errors, couldn't keep them in order?  And what did that lead to?  They realized that they could scrub the data using play streams and expected patterns to identify the errors in the data and clean it.

And they architected a system that had flexibility in the length of the time windows that you see on the right.  And they found how to make these inventions work with the video, using fingerprints to capture images on your screen rather than simply using audio, and to do so at regular intervals so you generated an ordered sequence of data that can be cataloged and organized and analyzed.

Now, those innovations led to granting these two patents in this case by the United States Patent and Trademark Office. We've seen these all week.

This was an important day for Anonymous.  Do you recall Mr. Otto's testimony?  He said he was proud.  He was proud to be part of this system and to innovate and to add something to this science.  He was proud to have started this company and to get those patents with his name on it.

And getting patent protection was a big step to the company and its financials.  Remember?  As soon as they started getting patents issued, what happened?  Companies

started knocking on their door, and that first company was RealityMine. We saw that contract; we talked about it the whole week. That was an exciting prospect for this young company. They were going to get an opportunity to put their technology into a media measurement panel to study how people liked watching the Olympics. There was a big deal with NBC on the horizon.

Now, that deal ended up not working out and they had to move on, but this is why we're here today. Because once that deal was terminated, they realized that something happened. There was a shift in the industry. After many years since filing their original application in 2004, something happened. By mid 2015, there was a shift. They started noticing two things.

First, the industry was no longer media measurement companies that gathered panels of volunteers to learn about media consumption. The days of panels were gone. Not because panels didn't work well, but for a different reason. Companies like Samsung realized if they took that technology that had been used in media measurement panel-based companies and put that technology into the smart TVs that we all buy, they can collect that data and perform that media measurement that way. And that's exactly what happened.

Now, some of you-all may be thinking that's competition. Tough luck. But that leads me to my second point. Did you

hear Mr. Otto testify about what they began to notice with that shift?  Samsung had started putting that technology in the TVs, and he observed that those TVs started exhibiting the very features that were the hallmark of Anonymous' technology down to the scale and the speed and the accuracy.  So Mr. Otto performed an investigation and what he found is that he believed Samsung was using his patented technology.

Samsung didn't scale up that system out of thin air.  Remember, it wasn't that Samsung put this technology into a few products, a few hundred products, a few thousand products.  This knowledge got put into over 50 million TVs.  They have 60 percent of the data the ACR data in the marketplace.

And what did we learn?  As long as the user turned it on, that data would start being captured by Samsung.  But if no one switches it on, they don't get any data.  So do you remember me showing you-all how us customers get that data going to Samsung?  One click.  Don't say anything about ACR on there.  It's just one click.  Go ahead and click ahead.

We walked through that with Mr. Roh.  They don't mention ACR in that data collection screen.  They call it viewer information services.  But it's automatic.  It's one click.  But they know.  Their internal documents, they say, hey, don't share this externally.  But we can say with confidence that the vast majority of TVs turn it on.

He said his job responsibility was to get the data

1082

because that means dollar signs.  Now, once they've got you, they make it impossible to turn it off, darn near impossible. We saw this, 18 clicks to get the thing turned off.  But that's what leads us to this case.  Once Samsung has the data, we learn that they have to organize it, and they have to clean it, they have to make it accurate.  And that's where Anonymous' patented technology comes in, which brings us to the first issue in the case which is infringement.

Now, you've heard about these burdens throughout the week.  My client Anonymous has the burden of proof on infringement.  It's called the preponderance of the evidence. If you weigh our infringement evidence on a scale, you heard this in openings, our evidence has to move just a little bit more.  We don't think we've got just a little by more evidence; we think we put a ton of bricks on that side of the scale.

We had Dr. Malek come through.  You recall him.  He's our infringement expert.  He's truly an expert, not just in software but in these particular distributed database systems. He's been in this industry for years.  He knows the technology.  He took the stand something like four hours, answered all the questions.  He went through all the source code, all the documents, all the evidence, all the testimony, all the patents.  And he showed you that they're all infringed.

1083

Starting with the '848 Patent, Mr. -- Dr. Malek showed you how this system is structured. It's a lot of technical information. It's very complicated. But he put in the work to make sure that you understood every nook and cranny in the code. Dr. Malek helped you focus on the relevant parts to understand how Samsung scrubs raw play streams using those fingerprints on the right, and he showed you what it looks like when you use it with an actual TV program.

Dr. Malek explained how those fingerprints are sent to the matching server, and he broke down that Samsung matches those fingerprints to the content IDs in the database, just like is described in Anonymous' patents.

Dr. Malek showed the code for how this works, including the live frame search result that contains a sequence of content IDs to be scrubbed from raw to clean.

We don't have to guess how to code works. Samsung's own internal documents tell you. We saw this right here. This shows you going from the raw play stream to the clean play stream using that confidence which is an expected pattern, just as described and taught in the patents.

Now, what does Samsung say about that? We saw this in opening. They say, hold on, now. There's only one play stream in our product. You guys need two; we only do one. Remember that? They showed you this slide right here?

But did you catch what happened throughout the trial?

Turned out to be a word game.  They were just ignoring the actual code and hiding it in this black decision logic box to try to make you think there wasn't scrubbing going on.

Their own expert, when testifying about this slide, he said, well, in that black box, stuff happens.  You hear that?  Stuff happens.  There's software and stuff happening there.  He didn't want to talk about what was happening inside that black decision box because if you looked inside of that black decision box like Dr. Malek did, that stuff that was happening was generating a clean play stream from a raw play stream--the invention and the infringement.  You-all already knew that because Dr. Malek walked you through it.

Now, what else did they say?  This is Samsung's counsel's opening statement.  He looked at you-all and said, the '848 Patent requires two separate play streams.  48 hours later, his own expert witness agreed with us.  He said, That's not what the claim requires; you don't need two separate play streams.

For the '848 Patent, Dr. Malek walked you through each and every element, showed you all the evidence, all the code, line by line, element by element, checked them all off.  We proved it with the evidence that the '848 Patent is in use by Samsung.

Now, the next patent, the '911, this is the time window patent.  Dr. Malek walked you through how this works, too.  He

1085

started by explaining how Samsung adjusts those time windows to make their system run better, capture better, cleaner data by adjusting the time length window based on the prior samples.  You saw that on the screen here.

He walked you through the source code, once again, Dr. Malek did, showing you how the system actually works to adjust those windows on the fly.  Samsung didn't rebut a single one.  I don't think they showed you a document about this patent.  They didn't rebut a single piece of this evidence on that '911 Patent.

What did they do instead?  They criticized Dr. Malek's use of this figure.  I don't if you caught this.  They say, hey, that's not our document, this is just a picture you made.  That's what they were criticizing him for.

But what did we show you right after?  This is Samsung's documentation.  These bars come straight from Samsung's own documents.  At most, they're criticizing Dr. Malek for not using pastel bars like Samsung does.  And this shows you exactly how they're changing the time window from three to one.  We saw witness after witness agree, they're changing it from three to one.

So what do they say next?  Well, they say, do you remember the trains in opening statement?  They said, hey, their patents require different length trains.  We do one length train all the time.  Do you remember that slide?  That

was a misdirection.  Look at this.  Watch this.  This is what their documents are really showing you.  On the right is how Samsung's documents show the system works; on the left is Samsung's opening statement.  We know which one to believe.

They've abandoned that theory now.  So then they say that Dr. Malek, he was actually focusing on the wrong stuff and that the three-to-one doesn't happen all on the TV as required by the patents.  It's not by the TV.  Look at what the documentation says, Samsung's own documentation.  The three-to-one happens right there on the client.  You know what the client is?  It's a fancy word for a TV.

We went through each and every element on that patent and proved to you infringement.  The '911 Patent's infringed.

Now, last but not least, plumb out of technical excuses, they say, well, hold on, we turned that feature off in 2023.  Remember that?  Now, they didn't tell us about that during the case.  They didn't show us a document about that.  You think Samsung doesn't keep corporate records of changing features like that?  They didn't show you a log file or a piece of source code.  They didn't change any of that stuff.  They just came in here at the last minute and say, oh, hey, we actually turned that thing off.  We flipped the switch in 2023.

It's irrelevant.  It doesn't change anything.  They're still infringing during the time period in this case even if you do believe that.

So how does Samsung infringe?  It's right here in the statute.  It's the Patent Act, § 271(a), by making, using, offering to sell this system here in the United States.

You're going to be asked to check those boxes on the verdict form for infringement.  We think that we've proven by a preponderance of the evidence that each and every element of the '848 and the '911 for each of the asserted claims should be emphatically checked yes.

Now, on the topic of damages, we saw this a lot.  This is the damages law.  Mr. Weinstein, our expert, carefully applied this law and walked through the evidence, and I'm going to quickly go through this.

He started with the total ad revenue.  Remember, this isn't the TV revenue or the cell phone revenue or the appliances.  We're focusing only on that ad revenue from the Samsung ad business.  What did he do?  He looked through all that information, and then he narrowed it down.  Right?  He applied that ACR percentage.  So we're focusing only on that ACR.  That's that ██████.

And they criticize this.  They say, oh, you're painting with too broad a brush.  But look at this:  Their own documents tell you that that ████████████ isn't just all ACR.  That's ACR for targeting.  That's what we're talking about in this case.

And then what did he do?  He applied that profit margin

to make sure he's not swooping up income that he shouldn't be. And then he had a premium percentage.  This is from that ratecard.  Remember those ratecards?  They show you how they sell an ad spot.  But then if you put the invention in there, you can charge a little bit more.  So he made sure to account for that.  So he's really narrowing in on the benefits of the invention here.

And then he applies an apportionment.  He focuses on just that fingerprint technology, just the scrubbing, and just the time window to make sure that we're focusing on the invention itself.

Then what does he do last?  He says, okay, we could take all that.  But to be conservative, we'll say that Samsung still gets to keep their expected rate of return, no profit margin on this deal.  And so that leads to a number of $78,512,999.  This is what it looks like in context.  That's the damages in this case.  So when you get to this verdict form, it says, how much?  That's your answer right there, $78,512,999.

Now, what did Samsung's experts say?  They said, well, hold on, at this hypothetical negotiation the parties would be talking about Ocean Tomo, RealityMine.  They'd be looking at those contracts.  He sat here and testified yesterday for 35 minutes.  Did he show a single Samsung document during that testimony?

I didn't see a single Samsung document.  He's Samsung's expert; he didn't show a single Samsung document.  He wanted you to look at a brokerage agreement for $2 million and say, That's what they would have agreed to.  Do you think Samsung and Anonymous would have agreed to a brokerage price in a patent license negotiation?  That doesn't make a lick of sense.

It's also not how you follow the law.  The law says you're supposed to focus on the use made of the invention by the infringer.  That's Samsung.  You don't look at Ocean Tomo and RealityMine.  So what do we do here?  Well, you got to fix it.  During that hypothetical negotiation, you focus on the Samsung documentation.  And that leads you to the answer that Mr. Weinstein gave you, which is $78,512,999.

THE COURT:  20 minutes have been used, counsel.

MR. McCARTY:  Thank you very much, sir.

Now, there's one more question on this value, and it's how do you split it.  Just as the experts explained, even Samsung's expert, Dr. Bederson, admitted the value is equal between the two; it's 50/50.

They tried to tell you that our patents are invalid, been a lot of talk about that.  Now, the thing that's bothers me about that one is almost everything they show you is basic ACR, things that they disclosed in their patent application.  If you're a doctor and you come up with a cool, very valuable

1090

new blood pressure sensor or blood pressure monitor, what are you going to put in your patent first thing?  You're going to explain what a blood pressure monitor is, you're going to talk about how those work.  Does that mean that your new blood pressure technology is invalid?  Of course not.  That's not how patents work.

This is Dr. Bederson.  He's certainly a smart guy, no doubt.  But the facts show that Samsung calls him multiple times a year for the last seven, eight years, they pay him pretty well, they hire him up to come in and offer opinions of invalidity so that Samsung might not have to pay a royalty.  He's tried to invalidate patents nearly every time Samsung hires him, and Samsung hires him a lot.

So when you hire an expert like that, you can take that into account:  Is he biased?  Are those opinions based on science, based on the code, based on the evidence, or are they based on something else?

Now, I'm going to skip through -- I don't have time to go through every prior art reference, but I don't think Dr. Bederson did, either.  What he really was trying to focus on was that Seet and Auditude reference.

Now, I believe Dr. Bederson gave up the farm on this one.  It's not a gotcha.  It's just a different technology.  How do we know this?  Our inventors used it as component in their system.  They didn't -- they know how it works.  It's a basic

ACR system and it wasn't very good, so they had to improve it. And that's where the inventions came from.

Now, I expect Mr. Unikel to make a big deal about how Seet wasn't in front of the Patent Office. The Seet reference is on the face of the patent. Did you stop and think about why that might be? Because Seet came after our patent. We don't believe it's prior art. Of course it wouldn't be in front of the Patent Office.

Look at the Court's instruction on this one. Samsung has the burden to show that the Seet Patent application is prior art by clear and convincing evidence. They can't do that. Why is that? Because when they filed their first application that did come before us, it was limited. It didn't disclose anything about our invention in the way that would invalidate it. And then they came back after us and tried to expand their invention. That's not proper. That certainly doesn't invalidate our invention.

And did you catch it? The prior art reference is a patent application. The Patent Office didn't grant them a patent. Seet doesn't have a patent on it. It's a patent application. They granted us our patent.

And if you dig into the technology like Dr. Malek did or like Dr. Hoarty did, it's not the same technology. That is database technology. It's helping to kind of make a nice, good database for the matching. It's not the full system that

does the full ACR scrubbing and -- with play streams and all that. It's just different technology.

And what did Mr. Seet say? He said he avoided using video data and focused instead on audio data. So they're coming in trying to tell you you should take these patents away based on audio technology from a company called Auditude and MusiKube in this video patent case about video technology. It doesn't make a lick of sense.

It's actually offensive to the inventors here. They know how Auditude/MusiKube worked. They worked with it in that initial Protonymous. They know it doesn't invalidate their patents. It's offensive. But you what it is not? It is not clear and convincing, and that's why that matters because in order to take these patents away, Samsung had to prove by clear and convincing evidence that each and every element of all those patent claims was invalid in view of Seet, the audio technology. That isn't even prior art. That's not clear and convincing.

The answer on the question of invalidity is emphatically no. They did not and cannot prove that these patents are invalid by clear and convincing evidence. It's clear as day.

Now, just a couple of more minutes before I sit down. One evening this week, my wife called me up. She's a nurse. She was -- she's been off for a few years while we were having kids and she's talking about going back to work. We were

1093

talking about it.  She could tell I was preoccupied.  She asked me what was wrong.  I couldn't put my finger on it.

This morning I woke up, and I put my finger on it.  That discussion was the night that I cross-examined Samsung's corporate representative.  And what was bugging me was, do you remember I had that question about Mr. Otto?  And the witness said, who?  I said, Mr. Otto, the inventor in the patent on this case, the one that's been sitting right there this whole trial.  And Samsung's witness didn't even know who it was.

They don't take this case seriously.  They think they're -- they're Samsung.  They can use the technology.  They don't need to pay for it.  What are we going to do?

You don't have to take my word for it.  Look at this.  This is the guy they brought.  He's been running the ACR product over there for 11 years.  Flew him over from Korea to testify for eight minutes, something like that.  He couldn't even be bothered to pick up the patent and read it.  This ACR case involving these ACR patents with this ACR witness from Samsung, he couldn't even be bothered to read the patent.

So on the one hand you've got Samsung's counsel in opening statements looking at you, saying, hey, we take this case seriously, we've been falsely accused, this is an important case for us.  The main guy hadn't even looked at the patent, and the other guy doesn't even know who the inventor is.

I'll leave you with this.  I think this contrast might be the most important yet because this case is about evidence. We got two technical experts in this technical case.  One of them looked, studied the source code for 36 days in its native environment to understand exactly how the system works, and he taught you guys how it works, and he proved infringement.

The other expert is a goose egg, zero.  He didn't sit and study the system.  He doesn't know it.  Yet he's trying to say, oh, it doesn't infringe, doesn't match the patent claims; and, by the way, the patents are invalid, might not be worth anything.

I'll end with this.  I'm going to sit down now where I've been sitting all week.  Mr. Unikel is going to come up stand up and talk, and I'm sure he'll put on a good presentation. He can say anything he wants to.  I can't change that.  But here's the thing:  Don't check your common sense at the door. You-all are judging the credibility of these witnesses and the evidence, and I know you can do that just fine.  Don't check your common sense at the door.

When they talk about, oh, we designed our system before the patents, well, remember, guys, we put the patents on file in '04.  It did take us some time to get them issued.  We're a small company.  We had to go piece by piece on it.  That doesn't matter.  The Court has instructed you if Samsung didn't know about the patents when they were designing that

system, it doesn't matter.  It's strict liability.  So don't check your common sense at the door.  The Judge has instructed you, it does not matter.

One other thing.  After Mr. Unikel sits down, my good friend Jason McManis gets to come up here and have the last word.  So when you listen to Mr. Unikel, remember Jason McManis is going to come up and give you his story, too.  So don't check your common sense at the door.

Thank you very much for your time.  We look forward to your verdict.

THE COURT:  All right.  Defendants may now present their closing argument to the jury.

Would you like a warning on your time, Mr. Unikel?

MR. UNIKEL:  Yes, please, Your Honor.  One at seven minutes and one at two minutes, please.

THE COURT:  All right.  I'll give you those warnings.

MR. UNIKEL:  Thank you very much.

THE COURT:  You may proceed with Defendants' closing argument.

MR. UNIKEL:  Good morning.  On behalf of Samsung, myself, our entire team, I want to thank you all for showing up, for putting in the very hard work over these last few days.  We sincerely appreciate the effort, and so thank you very much.

There are two core facts that are entirely undisputed in this case. Fact number one is that over the past 21 years, Anonymous Media has never successfully built a prototype or a product that actually practices the claims of the patents involved in this case. They never built a prototype that could scrub play streams of audio content identifications, they never built a system that could change the time length windows of samples or create playlists from clean play streams, and they never even tried to build a prototype or a product that could match video samples. Never even tried.

Fact number two, from 2015 to 2018, Samsung's engineers, including Mr. Roh, Mr. Joh, and Mr. Hwang, successfully built Samsung's smart TV ACR system from scratch. They put in the hard work to create a system that could in the real world handle billions of fingerprint matches every hour. Mr. Joh and Mr. Hwang received some of their own patents for their work, and Samsung is extremely proud of the incredible system they built and launched in May of 2018 before Anonymous had even filed the specific applications for the patents that are in this case.

In late 2023, five years after Samsung had fully launched its system, Anonymous filed this lawsuit accusing Samsung of infringing their patents requiring the use of two play streams and varying sample lengths.

Well, what does a company like Samsung do when it's

wrongly accused of patent infringement?  They fight back plain and simple just like anybody would.  That's why we're here in this courtroom.  Providing you with the evidence of why Samsung cannot and does not use the specific technological requirements that are in the patents that Anonymous received is our only way of fighting back, is our only way of showing you the truth.

Please make no mistake:  Samsung respects patents.  After all, as you heard, Samsung and Mr. Joh and Mr. Hwang have U.S. patents of their own, and they certainly expect those to be respected and honored.  And if Samsung wants to use someone else's technologies, they pay for it just like they did with Gracenote and other ACR technologies.

But patents don't give just an inventor rights to her invention; they also put limits on exactly what an inventor can say they invented.  They require the patent to put in the patent claims exactly what they say they invented, just like a land deed requires you to spell out the exact boundaries of your piece of land.  That way the entire world knows exactly what is required by the invention.

And under our country's patent laws, no one needs to pay for an invention defined by a patent claim that they do not use.  If a company is not using every single thing that's required by a patent claim, then there is no infringement and there's no reason that anybody would pay a dime.  That's how

the patent system works, and that system applies to Samsung just like it applies to Anonymous.

At the core, this case comes down to one critical question--what exactly did Anonymous invent.  In order to answer that question, you have to first understand everything that came before Anonymous.  You may have wondered why we spent so much time telling you about all the features that were disclosed in the prior art that's actually discussed in the patents, because when you understand just how extensive the knowledge of basic ACR was in 2004, you can start to understand just how small and specific the things that Anonymous put into its patents really are.

And, more importantly, you can understand why if the patent had known about the few but very important missing pieces of prior art like Auditude/MusiKube and Roberts and Konig and Berg, those specific requirements that Anonymous says it added to basic ACR would have been revealed as not new and extremely obvious.

Armed with your knowledge now of what existed in 2004, you know very well now what Anonymous did not invent.  They did not invent the creation of fingerprints or the processes for matching those fingerprints in a database.  They did not invent using samples of different lengths and adjusting those lengths as needed to help with identifications.

They did not invent the idea of logging content

identification results or creating time series playlists.  And they did not invent the idea of using fingerprint ACR to monitor media and ascertain viewing habits.  You know that because we took you through all of the pieces of prior art about basic ACR and what was well-known before Anonymous.

All of these were part of the ACR products and processes that Mr. Otto and Mr. Steuer admit existed and were well-known before Anonymous was formed.  Products like the Nielsen active/passive meters that Mr. Steuer references in his inventor presentations and products like Philips and Shazam that were referenced in the patents and that Mr. Steuer and Mr. Otto actually considered for using for their prototype before they settled on Auditude/MusiKube.

As the patents themselves admit, those skilled in the art will recognize that many such methods and algorithms exist.

So once again, what exactly did Anonymous invent?

Now, Anonymous just sort of loosely tried to suggest that they were the first to use video samples.  But the evidence doesn't even come close to supporting that claim.  Mr. Otto and Mr. Steuer both admitted that fingerprint ACR of both audio and video was known before 2003.

And perhaps most tellingly, you heard from Anonymous' own technical expert on validity issues, Mr. Hoarty.  I don't want you to miss the fact that Anonymous, not Samsung, paid Mr. Hoarty more than $50,000 to be Anonymous' expert on validity

1100

issues, and yet Samsung is the one who presented you with his testimony. We had to play you his testimony because he did not come here to appear for Anonymous.

And what you heard him say time and time again was that ACR was basic and well-understood for video for more than 25 years before Anonymous filed its patents. In fact, he told you that a person of skill in the art in 2004 would understand that disclosures of audio and video ACR were interchangeable because a skilled person would have known from any disclosure about audio ACR exactly how to implement video ACR and vice versa.

That's why Anonymous' suggestion now that you can somehow ignore all of the teachings about audio ACR that existed in publications like the Seet provisional or Konig make no sense at all. We know that any claim by Anonymous that's specifying the use of video samples somehow being an invention is flat wrong.

And, by the way, Mr. Otto and Mr. Steuer admitted that they never even tried to create a prototype that could perform ACR on video samples. They couldn't even successfully create a product that included everything in their patent claims for audio samples. So how can they credibly claim to you that they somehow made video ACR possible with a straight face? They can't.

Anonymous then loosely tried to suggest that it fixed the

problems that it encountered with ACR products like Auditude, but let's dig into that a little more carefully.  Mr. Otto and Mr. Steuer admitted in this courtroom that the ACR system that they used, Auditude/MusiKube, actually produced raw play streams that included content identification results, offset times, and confidence data.

That's exactly what the raw play streams called out in the '848 Patent are, which is why in their 2024 sworn declaration, Mr. Steuer and Mr. Otto actually used the sequence of results that they got from the Auditude module as evidence of raw play streams.

So what does the '848 Patent say to do with that raw play stream from Auditude?  It says to scrub it to correct any errors with the result of that error correction being a clean play stream.  That's it.  That is truly what Anonymous is now saying it added to Auditude/MusiKube that's supposedly an invention.

Was it really an invention to think that it might be beneficial to clean up any obvious errors?  That's not an invention; that's basic common sense.  And, in fact, Mr. Steuer and Mr. Otto did not even come up with that common sense idea for Auditude/MusiKube.

First you heard from Mr. Seet that Auditude/MusiKube's system confidence data was supposed to be used to correct any false positives, to scrub out any initial matches for which

1102

confidence was too low.  Second, the Seet Patent publication taught that any no-match should be replaced by inferring the identity of content from the pattern of surrounding matches, so you change out the no-match.

And, third, you saw that Roberts, another piece of prior art that was not given to the Patent Office before the patents issued, explicitly taught correcting errors in a play stream.

So did Anonymous really invent the idea of correcting errors in a raw play stream?  The evidence makes very clear they did not.

And, by the way, any suggestion that Mr. Otto and Mr. Steuer somehow fixed the Auditude module are demonstrably false.  They admit that they never succeeded in creating a prototype or a product that could actually scrub raw play streams of any size to produce clean play streams.  Mr. Otto said he had to create those manually on his computer using Microsoft Excel.

So that brings us back to the core question, what exactly did Anonymous invent?  After all you've learned, please really take a moment to try and put your finger on what they say they invented.  Was that an invention?

Now, think about this fact.  Not a single Anonymous witness, not a single one defended the validity of these patents.  Anonymous certainly had the chance to bring you evidence and testimony on this issue.  They hired a technical

expert, Dr. Malek. He was paid a good deal of money, he came here and testified for hours about infringement, but when it came time to be asked about the validity of the patents, he said he had no opinion on that.

So they hired another technical expert, Mr. Hoarty, and they didn't even bring you his testimony. We did. Why were we the ones who had to bring it? Perhaps it's because Mr. Hoarty, who is Anonymous' own paid expert on patent validity, could not identify any differences between the claimed inventions and the Auditude/MusiKube system or the Seet publications or a host of other prior art references.

You certainly never heard from Mr. Hoarty that these patents were valid. And if you think back on it, you really even never heard Mr. Otto or Mr. Steuer say how their alleged inventions differed from Auditude/MusiKube. All they actually said was that Auditude/MusiKube didn't work as well as they expected. It supposedly returned more missing matches than they wanted, and it returned the occasional out of order sequence.

But think about all that you heard from Mr. Seet about the features of Auditude before Anonymous existed. Remember his testimony as someone who has no interest in this case whatsoever, about the fact that any problems with the Auditude module may have been due to Mr. Otto's and Van Curtis' lack of understanding about how to use the module, not with the

1104

Auditude system itself.  Just because Mr. Otto couldn't figure out how to use Auditude correctly doesn't mean that Auditude/MusiKube was not a piece of prior art that included all of the fundamental steps of the patent.

And neither Mr. Steuer nor Mr. Otto ever actually explained to you exactly how their patent claims did anything truly new and not obvious compared to Auditude/MusiKube.

Now, Mr. Steuer and Mr. Otto did come clean about the fact that even though their 2004 provisional application mentioned MusiKube a single time, any reference to MusiKube or Auditude was taken out of the 2019 full applications for these patents when they were filed.  Auditude/MusiKube certainly did not appear in the list of references actually considered by the patent examiner before the patents were issued.

If Mr. Steuer and Mr. Otto really wanted to give the Patent Office everything it needed to make an informed decision in 2019, why eliminate the reference to MusiKube from the specification?  Why not mention in the 2019 application that MusiKube and Auditude were the exact fingerprinting solution that Anonymous used for its prototype?

Why not submit the information, including the examples of the raw play stream produced by Auditude that Mr. Otto and Mr. Steuer admitted they had sitting in their files for 20 years?  Why not give the Patent Office the chance to decide whether the inventions claimed in the '848 and '911 Patents were

1105

really new and not obvious in light of Auditude/MusiKube and the Seet Patent publication?

It was particularly important that they disclose this because Mr. Otto admitted that there had been a change in patent examiners in 2004. Why not give the new examiner the opportunity to consider Auditude/MusiKube?

The only evidence and explanation you heard regarding invalidity was from Dr. Bederson who showed you step by step exactly what was disclosed by the prior art, including the references that the Patent Office simply was not aware of before they issued these patents. Dr. Bederson took you through the Seet Patent publications and showed you how those publications taught every single element of the '848 Patent claims.

Anonymous tried to suggest that Mr. Seet's provisional somehow did not support his full patent application, but Dr. Bederson showed you how the figures of both publications matched and how the two publications included much of the same description, including undeniably overlapping disclosures about audio ACR matching.

While Anonymous would like to pretend that audio ACR disclosures are entirely different from video ACR disclosures, their own expert, Mr. Hoarty, admitted that a person of skill in the art would recognize audio disclosures like those in Seet as teaching both audio and video.

1106

Dr. Bederson then took you element-by-element through the combinations of Auditude plus Seet, Auditude plus Seet and Roberts, and showed you how those references together made obvious the claims of the '848 Patent.

He also took you element-by-element through the combinations of Konig and Berg and Konig, Berg, and Auditude to show you how the claims of the '911 Patent were also obvious to a person of skill in the art if the Patent Office had known all of the art that you now know.

Who from Anonymous ever offered any evidence or explanation to the contrary?  No one.  Who from Anonymous ever actually explained to you how the patents could possibly be new and not obvious in light of the information that wasn't provided to the Patent Office?  No one.

So after a week of trial, the evidence is beyond clear and convincing and it's unrebutted that the Patent Office had -- if the Patent Office had been aware of all the prior art information that you now have that the Patent Office did not, the Patent Office would never have issued these patents in 2020 and 2021.

The law gives you, the jury, the power to invalidate patents like these where the Patent Office was not given all the information that it needed to make the right decision.

Perhaps even more important in this case, however, the evidence shows that Samsung does not use the specific

1107

technological requirements that Anonymous had to put into its patents to separate itself from basic ACR. Samsung doesn't use these requirements because, quite simply, they would not work in a system, real-world system, that's dealing with the size of the data that Samsung is dealing with.

As we review the evidence, please keep in mind it's Anonymous' burden of proof to prove to you by a preponderance of the evidence that Samsung's system includes each and every element of the claims. As the Judge has already instructed you, if Anonymous cannot prove with real-world evidence that Samsung's system does every single thing required by the patents, if even one thing is missing, then the U.S. law says there is no infringement, period.

As you think back on the actual evidence, you're going to see that Anonymous cannot possibly carry its burden of proof.

Let's start with the '848 Patent. All that Anonymous can even try to claim it added are these specific elements: generating a raw play stream, scrubbing that raw play stream, and then generating a second clean play stream from the raw play stream. You know everything else here was described by commodity fingerprinting solutions that existed. The very plain claim language of the '848 Patent requires use of two play streams, one raw, one clean. More specifically, the clean play stream must be generated by making changes to the raw play stream. That is in the claims.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

The patent provides an example of what this might look like.  In this example from the patent, the raw play stream on the left, the clean play stream that is generated from the raw play stream is on the right.  You can see that the scrubbing is changing the missed content ID in row 2 in the raw to song 51 in the clean play stream on the right.  You can also see that in this example all no-matches are eliminated by the scrubbing.

Well, at the very start of the trial I asked you to keep an eye out for this document, and I know you saw it many times, JTX 6.  Every single technical witness, even Dr. Malek, has now confirmed for you that this is the one and only message of content identification results that Samsung's system produces when matching fingerprints.  This is the JSON message that Dr. Malek points to as being the clean play stream.  But, as promised, Anonymous was not able to show you a single raw or uncorrected version of this message that gets scrubbed to generate the message that you see on the right.  That's because, as you heard multiple times, there is never an initial version of this message, never.  This JSON message is the only list of results that's ever created in the Samsung system.

Dr. Malek's own analogy is very instructive on this.  He said that generating a clean play stream from a raw play stream is like starting with a first version of a Microsoft

1109

Word document, editing it, and then saving the edited version over the earlier version.  But, of course, that doesn't happen in Samsung's system because there is no earlier version of the JSON results message that gets changed in any way, let alone overwritten by the final message.

In fact, when you really think back, Dr. Malek and Anonymous could not and did not show you a single actual example of a real list of initial results in Samsung's system that gets changed.  Think about it.  Dr. Malek went through a very lengthy code review and slide presentation to make it seem like there must be a list somewhere that is changed because he never could or did show you an actual example of one.

It was a clever bit of sleight of hand because it made it seem that because he put in so much work and concluded there was infringement, there must have been a list somewhere.  If one of those lists, those initial lists that got corrected existed in Samsung's system, I can promise you that Dr. Malek, after his days of code review, his months of looking at Samsung's confidential materials, would have found it and shown it to you.  He didn't because it doesn't exist.

Because he could not find an actual raw list of results to show you, he showed you this Samsung training document to try and confuse you into believing that he found a list.  But Dr. Malek admitted that this document simply illustrates how

Samsung's system implements its, quote, content decision rule using confidence to make its decision about the one and only set of results that go into the JSON message.  Once again, Dr. Malek did not show you any actual list, a resulting list of three results that looks like a list in Samsung's system in operation because, explained by Mr. Joh and Mr. Hwang, no such list exists in Samsung's system.

As Dr. Bederson explained to you, in Samsung's system the single JSON message with the one and only list of content results is created by decision rules and logic that is implemented without the need for an initial uncorrected version of the message.  As he described, Samsung's process is like when his wife stands in front of her refrigerator and makes a single grocery list by mentally processing the data of what's in the fridge as compared to what she needs for the week.  This is different from the Anonymous method that is similar to starting with Dr. Bederson sending a first grocery list by text, and then having her change that list based on her review of what's in the fridge to create a new, clean version of that list that Dr. Bederson can use at the store.

Now, as you've learned, the difference between those approaches may seem small when you say it like that, but in a real-world system like Samsung's that difference is huge and makes a real difference.  Because Samsung's system is processing billions of fingerprints every hour, requiring the

use of an initial version, initial list to produce and edit to create the JSON would unnecessarily consume a massive amount of data.  Samsung went the other direction.  Samsung's system makes the choice to create just a single result message by having the system do its best to do correct decisions real-time.

And Samsung accepts that doing it this way results in less overall matches.  In fact, as you learned from Mr. Joh, about 40 percent of the return messages in Samsung's system show no match.  That's true--40 percent.  But that's okay in Samsung's system because with the massive number of fingerprint samples that are processed, a 60 percent match rate gives an accurate enough understanding of what people are watching.  That is essentially the opposite of what Dr. Steuer said they were accomplishing by using the two play stream approach, which is supposed to eliminate no matches by inferring results.

Ultimately Anonymous has not carried its burden of proving that there is a raw play stream of results that is scrubbed to generate this one and only message, which means that Samsung cannot infringe the patent.

And by the way, here's one really important thing I would like you to keep in mind.  If Anonymous was right that the '848 Patent claims somehow cover Samsung's use of initial matching data plus confidence data, then those claims are a

hundred percent invalid.

Think about it. To try and prove infringement, Anonymous says that in Samsung's system the initial matching data is the raw play stream, the confidence application is the scrubbing, the resulting value is the clean play stream. Well, if that is covered by the claims, then so is exactly what the Auditude/MusiKube module did in 2003. The Auditude module produced an initial stream of matching data, it produced confidence data, and each user of the Auditude system could then set its own decision rule to decide when confidence meant keeping the initial match or changing the initial match to no match because the confidence level was too low.

Anonymous can't have it both ways. If the use of confidence data is really covered by the '848 Patent claims, then those claims are invalid because Auditude did it first.

The simple fact is that Samsung does not use two play streams as explicitly required by the Anonymous '848 Patent.

Now let's consider the '911 sampling patent. What exactly did Anonymous invent here? What Anonymous claimed to add was the element requiring the time length window of the next sample is changed relative to the time length window of a first prior sample. Once again, everything else in this claim can be found in the commodity fingerprinting solutions that existed before.

You saw the patent's explanation of the supposed benefits

of changing the time length window, for example, from five seconds to three seconds, and, according to the patent, decreasing the length can decrease the amount of computer resources.  But that's only true in a small-scale system that's not processing the massive amount of data that Samsung's system has to process.

As you heard, because Samsung's system is processing billions of fingerprints every hour, if a decision needs to be made every time on every one of those samples whether the next sample should be a different length, the system would be overloaded.  So Samsung found a better way to save computer resources.  In Samsung's system, the length of every sample is always set to a single snapshot, a very small identical length.  It never changes.  This saves computer resources much better than Anonymous' required approach because it minimizes the length of each sample and eliminates the need for unnecessary decision-making about what the length of each sample should be compared to the last.  Mr. Joh, Mr. Hwang, and even Dr. Malek all agree on this.

If you needed any further proof that Samsung's system values efficiency more than anything else, you recall that Samsung actually turned off the no more frame functionality that Anonymous is accusing in May of 2023, six months before Anonymous filed this suit.  They turned it off because it was consuming more resources than it was worth.  So this isn't

1114

just lip service when Samsung says that it prioritizes efficiency, which is precisely why they do not change the time length window of their samples.

When you dig into the evidence, you'll recall that Dr. Malek did not really disagree that the screenshot fingerprints are the samples in Samsung's system.  For his analysis of the '848 Patent, and even element 1[a] of the '911 Patent claim, Dr. Malek admitted that each fingerprint is a separate sample.  But, of course, this recognition that the screenshots are the samples makes infringement of this patent impossible because the time length window of these never changes.  So in the middle of his analysis Dr. Malek just changes his definition of the sample from one snapshot to a series of three snapshots that are put together in a query message.

But no matter how Dr. Malek and Anonymous want to play word games around what is a sample, the simple fact remains that each sample, each piece of the video that is represented by a screenshot is always the same length.  It never goes from five seconds to three seconds.

By the way, even if Dr. Malek could be right that the sample magically becomes a query message in the need more frame scenario, there still would be no infringement because, as Dr. Bederson explained, first, the need more frame decision is made on the basis of one query, one query message, not

based on the two prior messages that don't match, which is what's required by the claims.

And second, the need more frame decision is made on the matching server, though even Dr. Malek admits that everything has to take place on the TV in order to meet that limitation for it all happening on one or more computers.  He admits that the TV is not the one that determines this part of the analysis.

In the end, the analysis of claim 1 of the '911 Patent is pretty simple and straightforward.  The claim requires that the time length window be changed for a second sample compared to a first sample, but in Samsung's system every sample is the same length--one snapshot long, never more, never less.  That means there is not infringement, and Anonymous certainly has not carried its burden of proving otherwise.

Now, I want to take a few moments to talk to you about the damages positions you heard in this case; not because Samsung owes anything, but because Anonymous' positions on damages make clear that they are not really interested in getting to the truth.

Make no mistake, ladies and gentlemen.  Samsung does not use these specific technologies and, therefore, under the law it is not required to pay anything.  That is just basic common sense and fairness.

When it comes to damages, think about what Anonymous is

saying.  Anonymous is asking for $78 million, but that demand ignores all the real-world evidence.  It ignores Anonymous' real-world agreements.  Anonymous' lawyer suggested to you that you should throw out this RealityMine agreement because it's a purchase agreement rather than a pure license agreement.  Of course this ignores that a purchase agreement includes ownership rights in addition to the rights to use the technology.

THE COURT:  Seven minutes remaining.

MR. UNIKEL:  Mr. Kidder was absolutely correct when he told you that because a purchase agreement includes and expands on what is granted by a pure license agreement, it must be considered in any damages analysis when an appropriate adjustment is made for the additional ownership rights that are part of the agreement.  And by the way, even Anonymous' own expert Mr. Weinstein admitted and agrees that the RealityMine agreement is a real-world agreement that should be considered as part of the *Georgia-Pacific* factor No. 1.

The Court's instructions mention that comparable licenses are similar to real estate comps.  If you've ever sold a house or a truck or any other property, you know what comps are, and if you want to know what something is worth, you go and you look at the comps.  That's everyday life.

So when you look at the real-world comps here, the RealityMine agreement and the Ocean Tomo agreement, the

picture is much different than $78 million.  In the RealityMine agreement, Anonymous and Mr. Steuer and Mr. Otto agreed to sell their entire patent portfolio, eight patents worth, to RealityMine for a maximum possible payment of $3.5 million.  In the end, they only got around $80,000 from RealityMine, but they were willing to accept a maximum possible amount of $3.5 million for everything.

And then in 2020 after Anonymous had no success in finding any other investor or company to buy or license Anonymous patents, Anonymous entered into an agreement with the patent broker Ocean Tomo.  And in their agreement with Ocean Tomo, Anonymous explicitly agreed to a reserve price of $2 million for the entire portfolio, including the two patents involved in this case and much more.  Even more telling, Ocean Tomo was allowed to tell potential buyers that the reserve price was $2 million.

As you heard, Ocean Tomo proceeded to send out a wave of non-specific solicitation emails to companies, including LG, Vizio, Samsung, and others.  But as it has been the case for the 15 years before that, no one who received a solicitation from Ocean Tomo expressed any interest, and Anonymous received no offers from anyone.

In spite of the entire industry's overwhelming lack of interest in Anonymous' specific technologies for more than two decades, and despite the RealityMine agreement and Ocean Tomo

1118

agreement, Anonymous and Mr. Weinstein are now telling you that Samsung would have agreed in 2020 to pay $78.5 million to Anonymous to license only two of the patents that were in Anonymous' portfolio.

By the way, Anonymous also wants you to ignore the fact that their own paid expert on apportionment and the technical value of the patents, Mr. Hoarty, did not come to explain that 40.3 percent number in any way.  Mr. Weinstein used that as a key part of his calculations.  You have no idea what it's based on.  That 40.3 percent number is entirely guesswork.

In fact, we, Samsung, showed you Mr. Hoarty's testimony that he had no opinion regarding any benefit of the patents over the ACR methods that came before and that are incorporated into Samsung's system.  We brought you Mr. Hoarty's testimony that he had not even considered whether the specific asserted claims of the '848 and '911 Patents offered any benefit whatsoever to Samsung.  So it's, frankly, impossible to understand how Mr. Weinstein could pin a key part of his damages analysis on blind faith acceptance of Mr. Hoarty's totally unsupported 40.3 percent apportionment number.

If there's any remaining doubt that Mr. Weinstein's analysis is totally separated from reality, you only have to remember his buy one get one free approach.  Mr. Weinstein says it does not matter how valuable each patent is or is not

to Samsung. According to him the $78.5 million damages number should be the same if either one of the patents is found not infringed or invalid. That makes no sense. One of the core purposes of this entire trial is to find out whether Anonymous' patents had any real-world value at all to Samsung, and if so, how much. For Mr. Weinstein to say he didn't even consider the value of each patent and whether it did or did not offer anything to Samsung makes it clear --

THE COURT: Two minutes remaining.

MR. UNIKEL: -- that for Anonymous this case is not about the truth at all.

In the end, ladies and gentlemen, the evidence has shown that Samsung does not infringe these patents.

When you go back to the jury room, we ask you to acknowledge that Samsung has been wrongfully accused in this case. Even big companies can be wrongfully accused, and the real-world evidence has shown that's the case here. Samsung built its own fingerprint ACR system before Anonymous even filed the specific applications for the patents involved in this case. And the technological requirements that Anonymous had to put in their patents to differentiate themselves from the ACR systems that existed, they simply would not work in Samsung's real-world system. Samsung built a real-world system; Anonymous never did. And nobody from Anonymous can ever tell you how or why what's in these patents is something

1120

new and not obvious over the art that the Patent Office simply did not have in front of it.

Samsung has been wrongfully accused.  We now leave it in your hands to follow the evidence and find the truth.

Thank you very much for your time.

THE COURT:  Plaintiff may now present its final closing argument to the jury.

You have 11 minutes and 5 seconds remaining, Mr. McManis.  Would you like a warning on your time?

MR. McMANIS:  Yes, Your Honor.  If I could get warnings at 6, 4, and 1 minute, please.

THE COURT:  Six minutes used or six minutes remaining?

MR. McMANIS:  Six minutes remaining.

THE COURT:  All right; six, four, and one.

You may proceed with your final argument.

MR. McMANIS:  Thank you, Your Honor.

When you're wrongfully accused you don't have to make up a story.  You don't have to change the facts to try and prove yourself right.

This is one of the slides that Samsung just showed you.  They said no one defended the validity of these patents.  That's not true.  Mr. Otto took the stand for about two hours.  He talked about exactly what his inventions were.  He sat there on cross examination.  Mr. Steuer took the stand and

1121

defended the validity of his patents.  And there's one other witness --

If I could see slide 214, please, Mr. Diaz.

I couldn't believe they played this yesterday.  This is Mr. Seet, the man who they say came up with the idea first.  He called Anonymous Media's invention unique.  He called it unique.  Their own witness defended the validity.

What did they bring in response to that?  They brought Dr. Bederson.

Can I see slide 242, please?

Your instructions from the Court say no hindsight.  Well, Dr. Bederson, all he had was hindsight.  He had never heard of any of these before Samsung picked them out, handed them to him, and paid him to testify that Anonymous Media's patents were invalid.

When you're wrongfully accused you don't have to change your story.

Mr. Unikel, if you were listening, he very carefully changed what he said to you from opening statement when he showed you this same slide.  Back in opening statements Mr. Unikel said it had to be two separate play streams.  Well, today he didn't use that word 'separate' because he knows his expert gave that up on the stand.  Dr. Bederson agreed it doesn't require that.  Our expert went to look at the code, their expert ignored it, drew a box around it, and

buried his head in the sand.

Could I see slide 145, please?

So now their story is that, Well, this has to be the play stream, this message down here. That's not what Dr. Malek pointed to. There's nothing in the claims--their own expert--nothing in the claims that requires the clean play stream, the raw play stream to be in any kind of JSON message.

Slide 153, please.

Dr. Malek, he proved to you that the code that does the scrubbing from raw to clean, it's on the server. It happens before that message. ██████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████. Their own expert didn't even look at it.

What else did they do? They showed you this slide from Mr. Seet talking about confidence. We got the instruction from the Court, and you'll have it with you in your deliberation room. It says you don't compare to the prior art for your infringement analysis. The Court actually instructed you to do the exact opposite of what their lawyer just asked you to do. If you're wrongfully accused, you can follow the Court's instructions; you don't have to run from them. That's what they're doing. They're changing their story and they're running from the evidence and the Court's instructions.

1123

He showed you this from Dr. Malek about frames.  The TV is not the one who determines the frame.  Take a look at the claim.  It's Joint Exhibit 3.  The change is made by the TV. The TV is the one that determines the fingerprint to go into the query message, the single fingerprint.  It's the TV.  It has to be based, at least in part, on a decision that's made whether or not it's a match.

THE COURT:  Six minutes remaining.

MR. McMANIS:  Thank you, Your Honor.

This is talking about the decision of the match, not the changing of the window.  It's more misdirection.  It's take your eye off the ball, ignore the evidence, and let us off the hook.

He talked about Mr. Hoarty.  You saw a lot of witnesses by deposition, and in the instructions, again, the Court said it has the same weight, it's the same oath.  They get up to seven hours to ask questions.  And instead of attacking Mr. Hoarty on substance, they complain that he's not here. You got to see the video.  We didn't go after any of their witnesses who testified by video to criticize them for not coming here.  That's what they're resorting to because they don't have facts to back it up.

They complain about the 40.3 percent number.  Did they offer anything different?  Did they put anything on the scale for that?  Nothing.  They had Dr. Bederson on the stand.  They

1124

could have asked him.  Nothing.

Slide 171, please.

Mr. Kidder admitted that Mr. Weinstein's damages analysis focused on Samsung's use.  He also admitted that none of his analysis did.  He gave you back-of-the-envelope math and tried to say that had something to do with a reasonable royalty in this case.

THE COURT:  Four minutes remaining.

MR. McMANIS:  Thank you, Your Honor.

It doesn't.  It has nothing to do with Samsung's use.

And Ocean Tomo?  $2 million?  No knowledge of anything from Samsung at that time.  To use an example, it would be like the price you might have agreed for your land before you knew that Exxon was going to drill $4 billion worth of oil and gas from underneath it.  Don't you think that would change how you think about things to begin with if you had knowledge of those facts?  Well, at the hypothetical negotiation you do; you have knowledge of that.

Samsung throughout this trial has made a big point of the fact that Mr. Otto, Mr. Steuer didn't pick up the phone to call them before they filed a lawsuit.  So I'll ask you, do you think it would have made a difference?  Do you think if they had sent a letter, Samsung would have done anything other than tear it up and throw it in the trash?

Their corporate representative took the stand the day

1125

09:45    after Mr. Otto testified and didn't even know who he was. They want you to believe they would have acted differently if they had picked up the phone?

The truth is Samsung knows they're a big company with more resources and more ability to fight than Anonymous Media, and the only protection a company like Anonymous Media has is 09:46 right here in this courtroom, because you heard in the instructions that inside of this courtroom they're equals, they are equals, and you-all, the jury, are the equalizer. When we are in front of you, we are on a level playing field, and that playing field since the founding of this country and 09:46 the Constitution and as enacted by congress is to protect inventions, to protect innovation like what Mr. Otto and Dr. Steuer developed.  Take a look around this courtroom--computers, monitors, microphones; hundreds if not thousands of patents have protected this technology, and the 09:47 only way to preserve those kinds of benefits, innovation, is if juries like you enforce the protection of patent rights. That's it.

THE COURT:  One minute to go, counsel.

MR. McMANIS:  This is your opportunity to do that. Without you, Mr. Otto could send all the letters in the world and it would never matter.  You are the only ones who can make 09:48 it matter, the only ones who can hold Samsung accountable for their use of the inventions, and the only ones who can tell

1126

Samsung that the life's work of Mr. Otto and Dr. Steuer is worth something.

Thank you. We look forward to your verdict.

THE COURT: All right, ladies and gentlemen, I'd like to provide you with just a few final instructions before you begin your deliberations. You must perform your duty as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. And all parties expect that you will carefully and impartially consider all the evidence, follow the law as I have given it to you, and reach a just verdict, regardless of the consequences. You've now heard all the evidence in this case, you've now heard arguments of counsel, and in just a few moments you're going to retire to the jury room, select one of your members as your foreperson, and begin deliberating on your verdict.

You'll remember at the beginning of the trial the Court instructed you not to discuss this case with each other until it was submitted to you. We're just about at that point.

That said, it's time for you to begin discussing the evidence with each other, and you may certainly express any opinions from the evidence that you have heard and use any reasonable means to persuade the other members of the jury to your convictions and to your honest opinions. You are to reach a verdict that speaks the truth and which does justice

to all parties without favor, bias, or prejudice, either for or against any party to this lawsuit.

Now, in the course of your deliberations, do not hesitate to re-examine your own views and to change your opinions if convinced it's erroneous, but don't surrender an honest conviction as to the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the mere purpose of returning a verdict.

Answer each question in the verdict form based on the facts as you find them to be, following the instructions the Court has given you concerning the law. Again, do not decide who you think should win this case and then answer the questions to reach that result.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. This is true even where one party is small and the other is large. This applies in patent cases between corporations, partnerships, or individuals. A patent owner is entitled to protect his rights under the laws of the United States, and this includes bringing a suit in a United States District Court seeking money damages based on allegations of infringement. By the very same token, an accused infringer is entitled to defend itself against assertions of infringement, including by arguing that it did not infringe

1128

the asserted patents, and that the patents-in-suit are invalid.

The law recognizes no distinction between types of parties.  All corporations, partnerships, other business organizations, and individuals stand equal before the law regardless of their size, regardless of who owns them, and they are to be treated as equals.

Now, when you retire to the jury room to deliberate on your verdict, as I've told you, you're each going to have your own individually printed copy of these final jury instructions to take with you.  If you desire during your deliberations to review any of the exhibits that the Court has admitted into evidence and have been shown to you over the course of the trial, you should advise me by sending me a written note signed by your foreperson identifying the exhibit or exhibits you would like to see, then give that note to the Court Security Officer who will bring it to me.  I will then send you that exhibit or those exhibits.  And let me remind you, demonstrative exhibits, as I have explained them to you and as opposed to exhibits, are not evidence, and I'm not going to be able to send demonstrative exhibits to you during your deliberations.

Now, once you retire, you should select your foreperson and then conduct your deliberations.  If you recess during your deliberations, follow all the instructions the Court has

given you about your conduct during the trial.  After you've reached a unanimous verdict, your foreperson is to fill in your unanimous answers to the questions in the verdict form, sign it, date it, and advise the Court Security Officer you've reached a verdict.  Do not reveal your answers until such time as you are discharged, unless otherwise instructed, and you must never disclose to anyone, ladies and gentlemen, not even to me, your numerical division on any unanswered question.

Any notes that you've taken over the course of this trial are aids to your memory only.  If your memory should differ from your notes, then rely on your memory and not your notes.  The notes are not evidence.  And a juror who has not taken notes or has taken very few notes must rely on his or her own independent recollection of the evidence and should not be unduly influenced by notes of other jurors.  Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony presented during the trial.

Now, if during your deliberations you want to communicate with me, you should give a written message or a question in writing signed by your foreperson and dated to the Court Security Officer, who will bring it to me.  And I'll then respond as promptly as possible, either in writing or by having you brought back into the courtroom where I can address you orally.  And I will always first disclose to the attorneys

in the case your message or question and my intended response before I respond to any message or question you might send me.

After you have reached a verdict and the Court has accepted your verdict and discharged you as jurors, at that point, ladies and gentlemen, you are not required to discuss with anybody your experience as a juror in this case. But at that point in time and by the very same token, you are free to discuss your experience as a juror with anyone of your choosing, but it is completely 100 percent up to you.

I'm now going to hand eight individual copies of these final jury instructions and one clean copy of the verdict form to the Court Security Officer to deliver to you in the jury room.

Ladies and gentlemen of the jury, you may now retire to the jury room to deliberate on your verdict. We await your decision.

(Whereupon, the jury left the courtroom.)

THE COURT: Counsel, you are free to wait here in the courtroom or to have a representative wait here in the courtroom. If you are off premises, do not go far so that with a short cell phone call we can get you back to the courtroom in the event of a message or a note from the jury or the return of their verdict.

Awaiting either a message from the jury or the return of their verdict, the Court stands in recess.

1131

(Jury deliberates.)

THE COURT:  Be seated, please.

Counsel, I've received the following note from the jury. It reads as follows:  "Your Honor, we have reached a verdict."  And it's signed by Mr. Jones, Juror No. 1, as the foreperson of the jury.

And I'll hand the original note to the Courtroom Deputy.

I'm about to bring in the jury and receive their verdict. It goes without saying, but let me just say anyway--whatever it is, I don't expect any reactions, visible or audible, from anybody, and we'll proceed accordingly.

All right.  Let's bring in the jury, Mr. Barnett.

(Whereupon, the jury entered the courtroom.)

THE COURT:  Please be seated, members of the jury.

Mr. Jones, I understand you're the foreperson of the jury.  Is that correct?

THE PRESIDING OFFICER:  Yes.

THE COURT:  Has the jury reached a verdict?

THE PRESIDING OFFICER:  Yes, Your Honor.  Yes, we have reached a verdict.

THE COURT:  All right.  Would you hand the completed verdict form to the Court Security Officer who will bring it to me.

Have a seat, sir.

Ladies and gentlemen, I'm about to announce the verdict

at this time.  I'd like each member of the jury to listen particularly carefully as I do this, because after I have announced the verdict into the record, I'm going to poll the members of the jury to ensure that this is, in fact, the unanimous verdict of all eight members of our jury.

Turning to the verdict form and beginning on page 4 where Question 1 is found, "Did Anonymous Media prove by a preponderance of the evidence that Samsung infringed any of the following claims?"

With regard to the '848 Patent, the jury's answer as to claim 1 is "Yes."

As to claim 5 of the '848 Patent, the jury's answer is "Yes."

As to claim 9, the jury's answer is "Yes."

And as to claim 13, the jury's answer is "Yes."

With regard to the '911 Patent and claim 1 of that patent, the jury's answer is "Yes."

Turning to Question 2 of the verdict form on page 5 thereof, "Did Samsung prove by clear and convincing evidence that any of the following claims are invalid?"

With regard to the '848 Patent and concerning claims 1, 5, 9, and 13, the jury's answer is "No."

With regard to the '911 Patent and claim 1 thereof, the jury's answer is "No."

Turning to Question 3A on page 6 of the verdict form,

1133

"What sum of money, if paid now in cash, do you find by a preponderance of the evidence would compensate Anonymous Media for Samsung's infringement which you have found?"

The jury's answer is "$78,512,999."  I'll say that again--$78,512,999.

Turning, then, to question 3B also on page 6 of the verdict form, "Regarding the sum awarded above in Question 3A, what percentage of this sum relates to the '848 Patent and what percentage relates to the '911 Patent?"

With regard to the '848 Patent, the jury's answer is "52 percent."

With regard to the '911 Patent, the jury's answer is "48 percent."

Turning, then, to page 7, which is the final page of the verdict form, I find that it is dated with today's date and it's signed by Mr. Jones as foreperson of the jury.

Ladies and gentlemen of the jury, let me poll you to make sure that this verdict as I have read it into the record is the unanimous verdict of all eight members of the jury.  If this is your verdict as I have read it, would you please stand up?

Thank you, ladies and gentlemen.  Please be seated.

Let the record reflect that all eight members of the jury immediately stood and rose in response to the Court's question to poll the jury.  That confirms that this is the unanimous

verdict of all eight members of the jury.  The Court accepts the jury's verdict, and I'll deliver the original verdict form to the Courtroom Deputy.

Ladies and gentlemen, this now completes the trial of this case.  From the very beginning I have given you extensive instructions about your conduct, and I have repeated them to you throughout the trial, probably more times than you wanted to hear.  Now that the trial is complete, now that I've accepted your verdict, I am discharging you as jurors in this case, which means you are no longer subject to any of the instructions I've given you about your conduct.  You can talk to anybody you'd like to about your service as a juror in this case.  You are also free not to talk to anybody about your service as a juror in this case.  It is 100 percent your decision.

I will let you know, just out of common courtesy, about the custom and practice in this court that's been in place for at least 40 years--it may be longer, but I know that it's been in place at least that long--and that is the lawyers in this case on both sides, whether they feel like they've won or lost, they are very interested in knowing what you thought about this trial, how they comported themselves, was there anything they could do better, was there anything that they did that you didn't like.  They're very interested in any feedback you might have.

1135

The rule in this court is they cannot initiate a conversation with you.  They have to hope that you will initiate a conversation with them.  But the way it works as a practical matter is there's only one way in and out of this building, and that's down those steps in the front.  And when you leave and go down those steps in the front, do not be surprised if the sidewalk is not highly populated with the lawyers in this case from both sides hoping that you will want to stop and initiate a conversation with them.

Again, it is completely your decision.  If you'd like to stop and talk with one or more of the lawyers in this case, I promise you they'll be interested to talk to you as long as you are willing to talk to them.  If you're not interested or willing to talk to any of them, they are not going to get in your way, they are not going to initiate a conversation with you, they are not going to do anything to impede you in any way.  And you're not required to have any conversation with them at all; it is strictly up to you.  But they will make it easy and convenient for you, I promise you.  That practice has been going on since I got out of law school shortly after Noah got off the ark.  But I want you to know about that.

Also, ladies and gentlemen, I know it's a Friday afternoon.  I know it's been a long week.  I can't tell you how much I appreciate the way you have worked with the Court.  You've been here on time, you've stayed late, you've powered

1136

through short breaks and recesses, you've done everything the Court's asked you to do, and I can't thank you enough for that.

I am not planning to keep you on a Friday afternoon, but I would like to ask a personal favor of you.  Before you leave the building, I'd like to ask you as a personal favor to me to go back in the jury room, and now that the case is over and I've discharged you as jurors, I'd like to come into the jury room and I'd like to shake each one of your hands and look each one of you personally in the eye and tell you thank you for your service in this case, because, quite honestly, ladies and gentlemen, each of you have performed very real and important public service.  The work you've done as the jury in this case is an important part of our continuing democracy in this country, and you've been participants--not just observers, but participants--in our democratic process throughout this trial, and I think that warrants -- the sacrifice you've all made, I think that warrants a particular personal word of thanks before you leave.  I promise I won't keep you long, but if you would do me that favor before you leave, I would certainly appreciate it.

Counsel, that completes the trial of this case.  The Court accepts the jury's verdict.  You are excused.

Ladies and gentlemen, I'll meet you in the jury room.

(The proceedings concluded at 2:30 p.m.)

I HEREBY CERTIFY THAT THE FOREGOING IS A

CORRECT TRANSCRIPT FROM THE RECORD OF

PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

COURT AND THE JUDICIAL CONFERENCE OF THE

UNITED STATES.


S/Shawn McRoberts                09/26/2025

_____DATE_____
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER